## In re RAHRER, Petitioner.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF KANSAS.

No. 1529. Argued March 17, 1891. — Decided May 25, 1891.

The act of August 8, 1890, 26 Stat. 313, c. 728, enacting "that all fermented, distilled or other intoxicating liquors or liquids transported into any State or Territory, or remaining therein for use, consumption, sale or storage therein, shall upon arrival in such State or Territory be subject to the operation and effect of the laws of such State or Territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such liquids or liquors had been produced in such State or Territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise" is a valid and constitutional exercise of the legislative power conferred upon Congress; and, after that act took effect, such liquors or liquids, introduced into a State or Territory from another State, whether in original packages or otherwise, became subject to the operation of such of its then existing

laws as had been properly enacted in the exercise of its police powers — among which was the statute in question as applied to the petitioner's offence.

THIS was an application for a writ of *habeas corpus* made to the Circuit Court of the United States for the District of Kansas by Charles A. Rahrer, who alleged in his petition that he was illegally and wrongfully restrained of his liberty by John M. Wilkerson, sheriff of Shawnee County, Kansas, in violation of the Constitution of the United States.

The writ was issued, and return having been made thereto, the cause was heard on the following agreed statement of facts:

"It is understood and agreed by and between the attorneys for the petitioner herein and the respondent that the above-entitled application to be discharged upon writ of *habeas corpus* shall be heard and decided upon the following facts, namely:

"That H. C. Maynard and Lisle Hopkins are citizens and residents of the State of Missouri, and are partners doing business at Kansas City, in the State of Missouri, under the firm name of Maynard, Hopkins & Co.; that said Maynard, Hopkins & Co. are and were at all the times herein mentioned doing a general wholesale business in Kansas City, in the State of Missouri, in the sale of intoxicating liquors; that said Maynard, Hopkins & Co. do a general business of packing and shipping intoxicating liquors from their place of business in Kansas City, in the State of Missouri, to various points in the State of Kansas and other States; that in June, 1890, the said Maynard, Hopkins & Co. constituted and appointed the petitioner herein, Charles Rahrer, a citizen of the United States, their lawful agent in the city of Topeka, in the State of Kansas, to sell and dispose of for them in original packages liquors shipped by the said Maynard, Hopkins & Co. from the State of Missouri to Topeka, in the State of Kansas; that in July, 1890, the said Maynard, Hopkins & Co. shipped to the city of Topeka, in the State of Kansas, from Kansas City, in the State of Missouri, a car-load of intoxicating liquors packed by them and shipped from Kansas City, in the State of Missouri, in

original packages, which car-load of intoxicating liquors so shipped was taken charge of by the petitioner herein, Charles Rahrer, at Topeka, in the State of Kansas, as the agent of Maynard, Hopkins & Co.; that on the 9th day of August, 1890, the said Charles Rahrer, as agent of the said Maynard, Hopkins & Co., offered for sale and sold in the original package a portion of said liquor, so shipped by the said Maynard, Hopkins & Co., to wit, one pony keg of beer, being a four-gallon keg, which keg was in the same condition in which it was shipped from Kansas City, in the State of Missouri, to Topeka, in the State of Kansas; that said keg of beer was separate and distinct from all other kegs of beer so shipped, and was shipped as a separate and distinct package by Maynard, Hopkins & Co. from Kansas City, in the State of Missouri.

"That the petitioner, Charles A. Rahrer, on the 9th day of August, 1890, offered for sale and sold one pint of whiskey, which was a portion of the liquor shipped by Maynard, Hopkins & Co., as above stated; that said pint of whiskey was sold in the same condition in which it was shipped from the State of Missouri and received in the State of Kansas; that it was separate and distinct from every other package of liquor so shipped, and was sold in the same package in which it was received, being securely enclosed in a wooden box of sufficient size to hold said pint bottle of whiskey.

"It is further agreed that Charles A. Rahrer, the petitioner herein, was not the owner of said liquor, but was simply acting as the agent of Maynard, Hopkins & Co., who were the owners of said liquor.

"That on the 21st day of August, 1890, there was filed in the office of the clerk of the District Court of Shawnee County, Kansas, an information by R. B. Welch, county attorney of said county, together with affidavit of Otis M. Capron and John C. Butcher, appended and attached thereto and in support thereof, taken under sec. 2543, General Statutes of 1889, charging the said Charles A. Rahrer with violating the prohibitory liquor law of the State of Kansas by making the two sales hereinbefore mentioned. A copy of

said information and affidavits so filed is attached to the return of the respondent herein and is hereby referred to and made a part hereof; that the petitioner herein, Charles A. Rahrer, was arrested upon a warrant issued upon the information and affidavit heretofore referred to and is held in custody by the respondent, John M. Wilkerson, sheriff of Shawnee County, by reason of said information so filed and said warrant so issued, and not otherwise.

"Said Charles A. Rahrer was not a druggist and did not have, nor did his principals, Maynard, Hopkins & Co., have, any druggist's permit at the time of making the said sales of intoxicating liquor hereinbefore mentioned, nor had he or they ever made any application for a druggist's permit to the probate judge of Shawnee County, Kansas, before making such sales of intoxicating liquor as aforesaid. The said sales of intoxicating liquors were not made by said Charles A. Rahrer upon a printed or written affidavit of the applicant for such intoxicating liquors, as required under the prohibitory laws of the State of Kansas.

"A copy of the warrant under and by virtue of which the respondent, John M. Wilkerson, sheriff of Shawnee County, holds the said Charles A. Rahrer is attached to the return of the respondent and is hereby referred to and made a part hereof.

"The recent act of Congress relating to intoxicating liquors and known as the 'Wilson bill' was signed by the President on August 8, A.D. 1890."

The Circuit Court discharged the petitioner, and the case was brought to this court by appeal. The opinion will be found in 43 Fed. Rep. 556.

The constitution of Kansas provides: "The manufacture and sale of intoxicating liquors shall be forever prohibited in this State, except for medical, scientific and mechanical purposes." 1 Gen. Stat. Kansas, 1889, p. 107. The sections of the Kansas statutes claimed to have been violated by the petitioner are as follows:

"Any person or persons who shall manufacture, sell or barter any spirituous, malt, vinous, fermented or other intoxicat-

ing liquors, shall be guilty of a misdemeanor, and punished as hereinafter provided: *Provided, however*, That such liquors may be sold for medical, scientific and mechanical purposes, as provided in this act.

"It shall be unlawful for any person or persons to sell or barter for medical, scientific or mechanical purposes, any malt, vinous, spirituous, fermented or other intoxicating liquors, without first having procured a druggist permit therefor from the probate judge of the county wherein such druggist may be doing business at the time," etc.

"Any person without taking out and having a permit to sell intoxicating liquors, as provided in this act, or any person not lawfully and in good faith engaged in the business of a druggist, who shall directly or indirectly sell or barter any spirituous, malt, vinous, fermented or other intoxicating liquors, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined in any sum not less than one hundred dollars nor more than five hundred dollars and be imprisoned in the county jail not less than thirty days nor more than ninety days."   1 Gen. Stat. Kansas, c. 31, §§ 380, 381, 386.

On August 8, 1890, an act of Congress was approved, entitled "An act to limit the effect of the regulations of commerce between the several States and with foreign countries in certain cases," which reads as follows: "That all fermented, distilled or other intoxicating liquors or liquids transported into any State or Territory or remaining therein for use, consumption, sale or storage therein, shall upon arrival in such State or Territory be subject to the operation and effect of the laws of such State or Territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such liquids or liquors had been produced in such State or Territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise."   26 Stat. 313, c. 728.

*Mr. A. L. Williams, Mr. J. N. Ives* and *Mr. R. B. Welch* for appellant, opposing the petitioner. *Mr. L. B. Kellogg*, Attorney General of Kansas, was with *Mr. Welch* on his brief.

*Mr. Louis J. Blum* and *Mr. David Overmyer* for appellee. *Mr. Edgar C. Blum* was with *Mr. Louis J. Blum* on his brief.

The commerce clause of the Constitution has been frequently before the court for construction, and the questions as to the extent of the power granted by it to Congress and its limitations upon state power have been firmly established. In *Gibbons* v. *Ogden*, 9 Wheat. 1, the court laid down the doctrine that the power granted to Congress under this clause was exclusive, and an inhibition upon the States. In *Sturges* v. *Crowninshield*, 4 Wheat. 122, it was held that whenever the terms in which a power is granted to Congress, or the nature of the power, require that it shall be exercised exclusively by Congress, the subject is completely taken away from the state legislatures. See also *Cooley* v. *Board of Wardens*, 12 How. 299; *Leisy* v. *Hardin*, 135 U. S. 100; *Lyng* v. *Michigan*, 135 U. S. 161; *McCall* v. *California*, 136 U. S. 104; *Norfolk & Western Railroad* v. *Pennsylvania*, 136 U. S. 114; *Minnesota* v. *Barber*, 136 U. S. 313.

Whether liquor, as an article of interstate commerce, belongs to the class subject to the exclusive control of Congress, or to that which may be regulated by the States, is not an open question. The State of Iowa enacted a statute forbidding common carriers to bring liquors into the State, unless consigned to a party holding a permit from the local authorities. The court held that the article in question belonged to commerce within the exclusive power of Congress, and that, as the statute in question was a regulation of such commerce, it was void. *Bowman* v. *Chicago & Northwestern Railway*, 125 U. S. 465. Subsequently it was decided that the right to import liquor into the State — a right which the State had in vain sought to destroy — included the right to sell it in the condition in which it was imported. *Leisy* v. *Hardin, supra.*

The statutes of Iowa referred to, and the statutes of Kansas in question, are similar in terms, and, by these decisions all must have been alike affected.

Admitting for the purpose of the argument, that the act of

Congress is a valid enactment, has it any effect upon the existing statute?

The statute in question virtually embraced two provisions; one regulating the internal commerce in liquor, the other applying to imported liquor. The latter was void when passed; but it is claimed that, by virtue of the terms of the act of Congress, there is now in force a state law prohibiting the sale of imported liquor, and the statute in question is relied upon in support of this contention. Up to the time of the passage of that act there was no such state law as the one claimed. When the court held the statute to be unconstitutional, so far as it applied to imported liquor, it decided in effect that the statute should never have been enacted, and that in law it never had been enacted. "An unconstitutional act is not a law. . . . It is in legal contemplation as though it had never been passed." *Norton* v. *Shelby County*, 118 U. S. 425. No other statute relating to imported liquor having thereafter been passed, there is no state law on the subject; and if, as is claimed, such a law has been created by the act of Congress, we have here a state law, enacted by the national legislature.

It may be said that the state statute in question in effect contains two provisions, and that the act of Congress is not designed to revive the provision relating to imported liquors, but seeks merely to extend the operation of the provision prohibiting the sale of domestic liquors, so as to embrace interstate commerce. If this is its intent, aside from the question as to the constitutional power of Congress to do this, the statute is more clearly subject to the objection that Congress cannot legislate directly for the States. If the State enacts a law covering one subject, and Congress then provides that the state law shall cover another and an entirely different subject, what is the statute, as changed? Unless it is intended to adopt the state law, and thus make it a law of Congress, the statute is clearly a new state law, enacted by Congress, under the police power of the State. Congress may, undoubtedly, afford a freer scope to the operation of state laws than they could otherwise obtain; but the state laws so acted upon by Congress must be valid laws, and relate to a subject within the control of Congress.

Before Congress acted there was no law of Kansas prohibiting the sale of imported liquor in its original package; there was no power in the State to enact it. Such a law, if there is any, owes its existence entirely to Congress; and, as Congress cannot legislate for the States, but can only make a state law a Federal measure by adoption, it necessarily follows that Congress has adopted the state statute in question.

If this statute has, by adoption, become a law of the United States, then an offence against it is punishable only in the Federal courts, and the state courts have no jurisdiction. Yet the Federal courts have no authority to punish the offence.

But Congress has no power to adopt this statute because it is not a fit subject for adoption. It is not now a law, nor has it ever to any legal purpose or intent had any existence. It would be just as reasonable, and as constitutional, for Congress to adopt, or legalize, the act of an individual claiming sovereign power, as to adopt a statute enacted by a legislature without authority. If it has been done in this instance, it is certainly an original and extraordinary mode of legislation, without precedent in congressional records. If, for example, some enterprising State should by statute create a national bank, and Congress should assent to the statute, would the bank have a legal existence? The case supposed would be analogous to the one at bar, it being in either case an attempt by the State to exercise the power of Congress to regulate interstate commerce, and an attempt by Congress to give existence to such legislation. The principles that can sustain the one will certainly justify the other. If we separate the valid from the void part of the statute, we find remaining only a statute confined to a subject within the exclusive control of the State, and Congress cannot adopt a state law having no relation to its own powers.

Before the passage of this bill the States had exhausted all their resources to bring the interstate commerce in liquor within their jurisdiction, and in vain. Towards the attainment of this end, the aid of Congress was then invoked, resulting in the enactment of this measure. But the commerce clause of the Constitution vests in Congress an exclusive power

to regulate interstate commerce of a national character, and the commerce in question here is of that character.

Here, then, is a law of Congress, conferring upon the States an authority to exercise the very power denied them by the Constitution. While Congress was doubtless actuated by worthy motives, and certainly cannot be chargeable with the design to defy the Constitution from which it derives its own existence and authority, we respectfully submit that such is the effect of its action. This conclusion is certainly irresistible, unless we find in the Constitution itself some provision enabling Congress to extend the state power in this regard, or to delegate to the States its own power to regulate this branch of interstate commerce. But, the United States and the States being distinct governments, sovereign and supreme within their respective spheres, and both alike being controlled by the Federal Constitution, it follows that the power of neither can be extended by the other.

Counsel for appellant says that the grant of power to Congress to regulate commerce with foreign nations and among the States is without limitation other than the discretion of Congress, and from that fact infers that its grant of power to the States by the act of 1890 is authorized because not expressly forbidden by the Constitution. It is true the grant of power to Congress is without limitations other than those prescribed by the Constitution, but the delegation of authority to the State is one of the limitations prescribed by the Constitution. The commercial power of Congress is not exceptional in this respect; every Federal power is subject to no limitation other than the requirements of the Constitution.

It would appear to be settled beyond all doubt, that the Constitution provides or allows no means by which a State can be enabled to legislate with respect to foreign or interstate commerce. That it does not possess the power as an attribute of its sovereignty, is certain. That Congress cannot confer or delegate to it this power, is no less clear. If, therefore, the act of 1890 subjects an article of interstate commerce to the state jurisdiction, what claim has it to validity? That it does subject an article of interstate commerce to the

state jurisdiction, admits of no doubt; for if the State statutes are to have any effect upon imported liquors, they are, to that extent, commercial regulations; and this was the express point decided in the case of *Bowman* v. *Chicago & North-western Railway Co.*, 125 U. S. 465.

The power to regulate commerce includes the right to determine what is commerce, subject to regulation. The latter power is incidental to the former; is, in fact, a component and essential part of it. If Congress can delegate a part of its commercial power to the States, it can certainly delegate any other part, and therefore the whole. This power is not withheld by the Constitution from the States in fractions, but as an entirety. If, therefore, Congress can allow the States to determine whether or not imported liquor shall be an article of commerce, subject to the power of Congress, it may delegate its entire commercial power to the States. In fact, it would be better to transfer its power, as a whole, than to leave it in this uncertain condition, subject to the varying policy of each particular State.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

The power of the State to impose restraints and burdens upon persons and property in conservation and promotion of the public health, good order and prosperity, is a power originally and always belonging to the States, not surrendered by them to the general government nor directly restrained by the Constitution of the United States, and essentially exclusive.

And this court has uniformly recognized state legislation, legitimately for police purposes, as not in the sense of the Constitution necessarily infringing upon any right which has been confided expressly or by implication to the national government.

The Fourteenth Amendment, in forbidding a State to make or enforce any law abridging the privileges or immunities of citizens of the United States, or to deprive any person of life,

liberty or property without due process of law, or to deny to any person within its jurisdiction the equal protection of the laws, did not invest, and did not attempt to invest Congress with power to legislate upon subjects which are within the domain of state legislation.

As observed by Mr. Justice Bradley, delivering the opinion of the court in the *Civil Rights Cases*, 109 U. S. 3, 13, the legislation under that amendment cannot "properly cover the whole domain of rights appertaining to life, liberty and property, defining them and providing for their vindication. That would be to establish a code of municipal law regulative of all private rights between man and man in society. It would be to make Congress take the place of the state legislatures and to supersede them. It is absurd to affirm that, because the rights of life, liberty and property (which include all civil rights that men have) are by the amendment sought to be protected against invasion on the part of the State without due process of law, Congress may therefore provide due process of law for their vindication in every case; and that, because the denial by a State to any persons, of the equal protection of the laws, is prohibited by the amendment, therefore Congress may establish laws for their equal protection."

In short, it is not to be doubted that the power to make the ordinary regulations of police remains with the individual States, and cannot be assumed by the National Government, and that in this respect it is not interfered with by the Fourteenth Amendment. *Barbier* v. *Connolly*, 113 U. S. 27, 31.

The power of Congress to regulate commerce among the several States, when the subjects of that power are national in their nature, is also exclusive. The Constitution does not provide that interstate commerce shall be free, but, by the grant of this exclusive power to regulate it, it was left free except as Congress might impose restraint. Therefore, it has been determined that the failure of Congress to exercise this exclusive power in any case is an expression of its will that the subject shall be free from restrictions or impositions upon it by the several States. *Robbins* v. *Shelby Taxing District*, 120 U. S. 489. And if a law passed by a State in the exercise of

its acknowledged powers comes into conflict with that will, the Congress and the State cannot occupy the position of equal opposing sovereignties, because the Constitution declares its supremacy and that of the laws passed in pursuance thereof. *Gibbons* v. *Ogden*, 9 Wheat. 1, 210. That which is not supreme must yield to that which is supreme. *Brown* v. *Maryland*, 12 Wheat. 419, 448.

"Commerce, undoubtedly, is traffic," said Chief Justice Marshall, "but it is something more; it is intercourse. It describes the commercial intercourse between nations and parts of nations in all its branches, and is regulated by prescribing rules for carrying on that intercourse." Unquestionably, fermented, distilled or other intoxicating liquors or liquids are subjects of commercial intercourse, exchange, barter and traffic, between nation and nation, and between State and State, like any other commodity in which a right of traffic exists, and are so recognized by the usages of the commercial world, the laws of Congress and the decisions of courts. Nevertheless, it has been often held that state legislation which prohibits the manufacture of spirituous, malt, vinous, fermented or other intoxicating liquors within the limits of a State, to be there sold or bartered for general use as a beverage, does not necessarily infringe any right, privilege or immunity secured by the Constitution of the United States or by the amendments thereto. *Mugler* v. *Kansas*, 123 U. S. 623, and cases cited. "These cases," in the language of the opinion in *Mugler* v. *Kansas* (p. 659,) "rest upon the acknowledged right of the States of the Union to control their purely internal affairs, and, in so doing, to protect the health, morals, and safety of their people by regulations that do not interfere with the execution of the powers of the general government, or violate rights secured by the Constitution of the United States. The power to establish such regulations, as was said in *Gibbons* v. *Odgen*, 9 Wheat. 1, 203, reaches everything within the territory of a State not surrendered to the national government." But it was not thought in that case that the record presented any question of the invalidity of state laws, because repugnant to the power to regulate commerce among

the States. It is upon the theory of such repugnancy that the case before us arises, and involves the distinction which exists between the commercial power and the police power, which "though quite distinguishable when they do not approach each other, may yet, like the intervening colors between white and black, approach so nearly as to perplex the understanding, as colors perplex the vision in marking the distinction between them." 12 Wheat. 441.

And here the sagacious observations of Mr. Justice Catron, in the *License Cases*, 5 How. 599, may profitably be quoted, as they have often been before: "The law and the decision apply equally to foreign and to domestic spirits, as they must do on the principles assumed in support of the law. The assumption is, that the police power was not touched by the Constitution, but left to the States as the Constitution found it. This is admitted; and whenever a thing, from character or condition, is of a description to be regulated by that power in the State, then the regulation may be made by the State, and Congress cannot interfere. But this must always depend on facts, subject to legal ascertainment, so that the injured may have redress. And the fact must find its support in this, whether the prohibited article belongs to, and is subject to be regulated as part of, foreign commerce, or of commerce among the States. If, from its nature, it does not belong to commerce, or if its condition, from putrescence or other cause, is such when it is about to enter the State that it no longer belongs to commerce, or, in other words, is not a commercial article, then the state power may exclude its introduction. And as an incident to this power, a State may use means to ascertain the fact. And here is the limit between the sovereign power of the State and the Federal power. That is to say, that which does not belong to commerce is within the jurisdiction of the police power of the State; and that which does belong to commerce is within the jurisdiction of the United States. And to this limit must all the general views come, as I suppose, that were suggested in the reasoning of this court in the cases of *Gibbons* v. *Ogden*; *Brown* v. *The State of Maryland*; and *New York* v. *Miln*. What, then, is

the assumption of the state, court? Undoubtedly, in effect, that the State had the power to declare what should be an article of lawful commerce in the particular State; and, having declared that ardent spirits and wines were deleterious to morals and health, they ceased to be commercial commodities there, and that then the police power attached, and consequently the powers of Congress could not interfere. The exclusive state power is made to rest, not on the fact of the state or condition of the article, nor that it is property usually passing by sale from hand to hand, but on the declaration found in the state laws, and asserted as the state policy, that it shall be excluded from commerce. And by this means the sovereign jurisdiction in the State is attempted to be created, in a case where it did not previously exist. If this be the true construction of the constitutional provision, then the paramount power of Congress to regulate commerce is subject to a very material limitation; for it takes from Congress, and leaves with the States, the power to determine the commodities, or articles of property, which are the subjects of lawful commerce. Congress may regulate, but the States determine what shall or shall not be regulated. Upon this theory, the power to regulate commerce, instead of being paramount over the subject, would become subordinate to the state police power; for it is obvious that the power to determine the articles which may be the subjects of commerce, and thus to circumscribe its scope and operation, is, in effect, the controlling one. The police power would not only be a formidable rival, but, in a struggle, must necessarily triumph over the commercial power, as the power to regulate is dependent upon the power to fix and determine upon the subjects to be regulated. The same process of legislation and reasoning adopted by the State and its courts could bring within the police power any article of consumption that a State might wish to exclude, whether it belonged to that which was drank, or to food and clothing; and with nearly equal claims to propriety, as malt liquors and the produce of fruits other than grapes stand on no higher grounds than the light wines of this and other countries, excluded, in effect, by the law as it now stands.

And it would be only another step to regulate real or supposed extravagance in food and clothing. And in this connection it may be proper to say, that the three States whose laws are now before us had in view an entire prohibition from use of spirits and wines of every description, and that their main scope and object is to enforce exclusive temperance as a policy of State, under the belief that such a policy will best subserve the interests of society; and that to this end, more than to any other, has the sovereign power of these States been exerted; for it was admitted, on the argument, that no licenses are issued, and that exclusion exists, so far as the laws can produce the result, — at least, in some of the States, — and that this was the policy of the law. For these reasons, I think the case cannot depend on the reserved power in the State to regulate its own police." And the learned judge reached the conclusion that the law of New Hampshire, which particularly raised the question, might be sustained as a regulation of commerce, lawful, because not repugnant to any actual exercise of the commercial power by Congress. In respect of this the opposite view has since prevailed, but the argument retains its force in its bearing upon the purview of the police power as not concurrent with and necessarily not superior to the commercial power.

The laws of Iowa under consideration in *Bowman* v. *Railway Company*, 125 U. S. 465, and *Leisy* v. *Hardin*, 135 U. S. 100, were enacted in the exercise of the police power of the State, and not at all as regulations of commerce with foreign nations and among the States, but as they inhibited the receipt of an imported commodity, or its disposition before it had ceased to become an article of trade between one State and another, or another country and this, they amounted in effect to a regulation of such commerce. Hence, it was held that inasmuch as interstate commerce, consisting in the transportation, purchase, sale and exchange of commodities, is national in its character and must be governed by a uniform system, so long as Congress did not pass any law to regulate it specifically, or in such way as to allow the laws of the State to operate upon it, Congress thereby indicated its will that such

commerce should be free and untrammelled, and therefore that the laws of Iowa, referred to, were inoperative, in so far as they amounted to regulations of foreign or interstate commerce, in inhibiting the reception of such articles within the State, or their sale upon arrival, in the form in which they were imported there from a foreign country or another State. It followed as a corollary, that when Congress acted at all, the result of its action must be to operate as a restraint upon that perfect freedom which its silence insured.

Congress has now spoken, and declared that imported liquors or liquids shall, upon arrival in a State, fall within the category of domestic articles of a similar nature. Is the law open to constitutional objection?

By the first clause of section 10 of Article I of the Constitution, certain powers are enumerated which the States are forbidden to exercise in any event; and by clauses two and three, certain others, which may be exercised with the consent of Congress. As to those in the first class, Congress cannot relieve from the positive restriction imposed. As to those in the second, their exercise may be authorized; and they include the collection of the revenue from imposts and duties on imports and exports, by state enactments, subject to the revision and control of Congress; and a tonnage duty, to the exaction of which only the consent of Congress is required. Beyond this, Congress is not empowered to enable the State to go in this direction. Nor can Congress transfer legislative powers to a State nor sanction a state law in violation of the Constitution; and if it can adopt a state law as its own, it must be one that it would be competent for it to enact itself, and not a law passed in the exercise of the police power. *Cooley* v. *Port Wardens of Philadelphia*, 12 How. 299; *Gunn* v. *Barry*, 15 Wall. 610, 623; *United States* v. *Dewitt*, 9 Wall. 41.

It does not admit of argument that Congress can neither delegate its own powers nor enlarge those of a State. This being so, it is urged that the act of Congress cannot be sustained as a regulation of commerce, because the Constitution, in the matter of interstate commerce, operates *ex proprio vigore* as a restraint upon the power of Congress to so regulate

it as to bring any of its subjects within the grasp of the police power of the State. In other words, it is earnestly contended that the Constitution guarantees freedom of commerce among the States in all things, and that not only may intoxicating liquors be imported from one State into another, without being subject to regulation under the laws of the latter, but that Congress is powerless to obviate that result.

Thus the grant to the general government of a power designed to prevent embarrassing restrictions upon interstate commerce by any State, would be made to forbid any restraint whatever. We do not concur in this view. In surrendering their own power over external commerce the States did not secure absolute freedom in such commerce, but only the protection from encroachment afforded by confiding its regulation exclusively to Congress.

By the adoption of the Constitution the ability of the several States to act upon the matter solely in accordance with their own will was extinguished, and the legislative will of the general government substituted. No affirmative guaranty was thereby given to any State of the right to demand as between it and the others what it could not have obtained before; while the object was undoubtedly sought to be attained of preventing commercial regulations partial in their character or contrary to the common interests. And the magnificent growth and prosperity of the country attest the success which has attended the accomplishment of that object. But this furnishes no support to the position that Congress could not, in the exercise of the discretion reposed in it, concluding that the common interests did not require entire freedom in the traffic in ardent spirits, enact the law in question. In so doing Congress has not attempted to delegate the power to regulate commerce, or to exercise any power reserved to the States, or to grant a power not possessed by the States, or to adopt state laws. It has taken its own course and made its own regulation, applying to these subjects of interstate commerce one common rule, whose uniformity is not affected by variations in state laws in dealing with such property.

The principle upon which local option laws, so called, have

been sustained is, that while the legislature cannot delegate its power to make a law, it can make a law which leaves it to municipalities or the people to determine some fact or state of things, upon which the action of the law may depend; but we do not rest the validity of the act of Congress on this analogy. The power over interstate commerce is too vital to the integrity of the nation to be qualified by any refinement of reasoning. The power to regulate is solely in the general government, and it is an essential part of that regulation to prescribe the regular means for accomplishing the introduction and incorporation of articles into and with the mass of property in the country or State. 12 Wheat. 448.

No reason is perceived why, if Congress chooses to provide that certain designated subjects of interstate commerce shall be governed by a rule which divests them of that character at an earlier period of time than would otherwise be the case, it is not within its competency to do so.

The differences of opinion which have existed in this tribunal in many leading cases upon this subject, have arisen, not from a denial of the power of Congress, when exercised, but upon the question whether the inaction of Congress was in itself equivalent to the affirmative interposition of a bar to the operation of an undisputed power possessed by the States.

We recall no decision giving color to the idea that when Congress acted its action would be less potent than when it kept silent.

The framers of the Constitution never intended that the legislative power of the nation should find itself incapable of disposing of a subject matter specifically committed to its charge. The manner of that disposition brought into determination upon this record involves no ground for adjudging the act of Congress inoperative and void.

We inquire then whether fermented, distilled, or other intoxicating liquors or liquids transported into the State of Kansas, and there offered for sale and sold, after the passage of the act, became subject to the operation and effect of the existing laws of that State in reference to such articles. It is said that this cannot be so, because, by the decision in *Leisy* v.

*Hardin,* similar state laws were held unconstitutional, in so far as they prohibited the sale of liquors by the importer in the condition in which they had been imported. In that case, certain beer imported into Iowa had been seized in the original packages or kegs, unbroken and unopened, in the hands of the importer, and the Supreme Court of Iowa held this seizure to have been lawful under the statutes of the State. We reversed the judgment upon the ground that the legislation to the extent indicated, that is to say, as construed to apply to importations into the State from without and to permit the seizure of the articles before they had by sale or other transmutation become a part of the common mass of property of the State, was repugnant to the third clause of section eight of article one of the Constitution of the United States, in that it could not be given that operation without bringing it into collision with the implied exercise of a power exclusively confided to the general government. This was far from holding that the statutes in question were absolutely void, in whole or in part, and as if they had never been enacted. On the contrary, the decision did not annul the law, but limited its operation to property strictly within the jurisdiction of the State.

In *Chicago, Milwaukee &c. Railway* v. *Minnesota,* 134 U. S. 418, it was held that the act of the legislature of the State of Minnesota of March 7, 1887, establishing a railroad and warehouse commission, as construed by the Supreme Court of that State, by which construction we were bound in considering the case, was in conflict with the Constitution of the United States in the particulars complained of by the railroad company, but nevertheless the case was remanded, with an instruction for further proceedings. And Mr. Justice Blatchford, speaking for this court, said: "In view of the opinion delivered by that court, it may be impossible for any further proceedings to be taken other than to dismiss the proceeding for a mandamus, if the court should adhere to its opinion that, under the statute, it cannot investigate judicially the reasonableness of the rates fixed by the commission."

In *Tiernan* v. *Rinker,* 102 U. S. 123, an act of the legislature of the State of Texas levying a tax upon the occupation

of selling liquors, malt and otherwise, but not of selling domestic wines or beer, was held inoperative so far as it discriminated against imported wines or beer, but as Tiernan was a seller of other liquors as well as domestic, the tax against him was upheld.

In the case at bar, petitioner was arrested by the state authorities for selling imported liquor on the 9th of August, 1890, contrary to the laws of the State. The act of Congress had gone into effect on the 8th of August, 1890, providing that imported liquors should be subject to the operation and effect of the state laws to the same extent and in the same manner as though the liquors had been produced in the State; and the law of Kansas forbade the sale. Petitioner was thereby prevented from claiming the right to proceed in defiance of the law of the State, upon the implication arising from the want of action on the part of Congress up to that time. The laws of the State had been passed in the exercise of its police powers, and applied to the sale of all intoxicating liquors whether imported or not, there being no exception as to those imported, and no inference arising, in view of the provisions of the state constitution and the terms of the law, (within whose mischief all intoxicating liquors came,) that the State did not intend imported liquors to be included. We do not mean that the intention is to be imputed of violating any constitutional rule, but that the state law should not be regarded as less comprehensive than its language is, upon the ground that action under it might in particular instances be adjudged invalid from an external cause.

Congress did not use terms of permission to the State to act, but simply removed an impediment to the enforcement of the state laws in respect to imported packages in their original condition, created by the absence of a specific utterance on its part. It imparted no power to the State not then possessed, but allowed imported property to fall at once upon arrival within the local jurisdiction.

It appears from the agreed statement of facts that this liquor arrived in Kansas prior to the passage of the act of Congress, but no question is presented here as to the right of

the importer in reference to the withdrawal of the property from the State, nor can we perceive that the Congressional enactment is given a retrospective operation by holding it applicable to a transaction of sale occurring after it took effect. This is not the case of a law enacted in the unauthorized exercise of a power exclusively confided to Congress, but of a law which it was competent for the State to pass, but which could not operate upon articles occupying a certain situation until the passage of the act of Congress. That act in terms removed the obstacle, and we perceive no adequate ground for adjudging that a reënactment of the state law was required before it could have the effect upon imported which it had always had upon domestic property.

Jurisdiction attached, not in virtue of the law of Congress, but because the effect of the latter was to place the property where jurisdiction could attach.

*The decree is reversed, and the cause remanded for further proceedings in conformity with this opinion.*

MR. JUSTICE HARLAN, MR. JUSTICE GRAY and MR. JUSTICE BREWER concurred in the judgment of reversal, but not in all the reasoning of the opinion of the court.