## UNITED STATES v. GREEN.

(District Court, N. D. New York. April 26, 1905.)

1. **RENOVATED BUTTER—INTERSTATE COMMERCE—PACKAGES—STAMPS—REMOVAL —OFFENSES—STATUTES.**

Act Cong. May 9, 1902, c. 784, 32 Stat. 193 [U. S. Comp. St. Supp. 1903, p. 265], providing for the inspection of renovated butter, imposes a special tax thereon, represented by coupon stamps; and section 5, 32 Stat. 196 [U. S. Comp. St. Supp. 1903, p. 269], declares that all applicable parts of Act Aug. 13, 1890, c. 839, 26 Stat. 414 [U. S. Comp. St. 1901, p. 3185], providing for inspection of meats for export, and of Act March 3, 1891, c. 555, 26 Stat. 1090, as amended March 2, 1895, c. 169, 28 Stat. 732 [U. S. Comp. St. 1901, p. 3190], providing for the inspection of live cattle, etc., carcasses, meat products, etc., which are the subject of interstate com-

merce, shall apply to process or renovated butter. Act Cong. March 3, 1891, § 4, as amended by Act March 2, 1895, § 3, requires inspected meat products to be stamped and labeled, and declares that any person who shall knowingly and wrongfully deface and destroy any such stamps, according to the regulations of the Secretary of Agriculture, shall be guilty of a misdemeanor. *Held*, that such section 4 was applicable to the oleomargarine act, so that the removal of stamps and caution notices attached to original packages of renovated butter, which is the subject of interstate commerce, constituted an offense.

2. SAME—TERMINATION OF INTERSTATE COMMERCE—SUBSEQUENT ACTS—EFFECT.
Under Oleomargarine Act (Act Cong. May 9, 1902, c. 784, 32 Stat. 193 [U. S. Comp. St. Supp. 1903, p. 370]) § 1, declaring that renovated butter transported into any state, and remaining there for use or sale, shall on arrival be subject to state laws for the exercise of police powers, as though produced within the state, the arrival of renovated butter, duly stamped and labeled as provided by such act, within a state other than that from which it was shipped, did not divest the butter of its interstate commerce character, so as to immediately entitle the consignee to remove such marks and labels, without liability for violating such act.

Demurrer to indictment charging the defendant, a wholesale importer and dealer in butter, with the crime of having removed, at Binghamton, Broome county, N. Y., the words "Renovated Butter," also the stamps and caution notices, from original packages of that article manufactured, so labeled or marked, and so stamped, etc., and sold to the defendant in the state of Ohio, and by him brought or shipped into the state of New York for sale at wholesale and in improper packages, and there resold after the said words, stamps, and notices had been removed. By this act of removing the said words and such stamps and notices from such packages, the defendant is alleged to have committed a crime, in violation of the acts of March 2, 1895, c. 169, § 4, 28 Stat. 732 [U. S. Comp. St. 1901, p. 3190], March 2, 1901, c. 805, 31 Stat. 926 [U. S. Comp. St. 1901, p. 3193], and May 9, 1902, c. 784, 32 Stat. 193 [U. S. Comp. St. Supp. 1903, p. 408]. The defendant demurs on the ground that the said acts do not constitute a crime.

Geo. B. Curtiss, U. S. Atty.
A. M. Sperry, for defendant.

RAY, District Judge. By the oleomargarine act approved May 9, 1902, c. 784, 32 Stat. 194 [U. S. Comp. St. Supp. 1903, p. 267] (Public No. 110), it is provided (section 4), after defining butter and "adulterated butter":

"* * * That 'process butter' or 'renovated butter' is hereby defined to mean butter which has been subjected to any process by which it is melted, clarified or refined and made to resemble genuine butter, always excepting 'adulterated butter' as defined by this act. That special taxes are imposed as follows: Manufacturers of process or renovated butter shall pay fifty dollars per year and manufacturers of adulterated butter shall pay six hundred dollars per year. Every person who engages in the production of process or renovated butter or adulterated butter as a business shall be considered to be a manufacturer thereof. * * * That every person who carries on the business of a manufacturer of process or renovated butter or adulterated butter without having paid the special tax therefor, as required by law, shall, besides being liable to the payment of the tax, be fined not less than one thousand and not more than five thousand dollars. * * * That every manufacturer of process or renovated butter or adulterated butter shall file with the collector of internal

revenue of the district in which his manufactory is located such notices, inventories, and bonds, shall keep such books and render such returns of material and products, shall put up such signs and affix such number of his factory, and conduct his business under such surveillance of officers and agents as the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, may by regulation require. But the bond required of such manufacturer shall be with sureties satisfactory to the collector of internal revenue, and in a penal sum of not less than five hundred dollars; and the sum of said bond may be increased from time to time and additional sureties required at the discretion of the collector or under instructions of the Commissioner of Internal Revenue. * * * That upon adulterated butter, when manufactured or sold or removed for consumption or use, there shall be assessed and collected a tax of ten cents per pound, to be paid by the manufacturer thereof, and any fractional part of a pound shall be taxed as a pound, and that upon process or renovated butter, when manufactured or sold or removed for consumption or use, there shall be assessed and collected a tax of one-fourth of one cent per pound, to be paid by the manufacturer thereof, and any fractional part of a pound shall be taxed as a pound. The tax to be levied by this section shall be represented by coupon stamps, and the provisions of existing laws governing engraving, issuing, sale, accountability, effacement, and destruction of stamps relating to tobacco and snuff, as far as applicable, are hereby made to apply to the stamps provided by this section."

## Section 5 provides as follows:

"All parts of an act providing for an inspection of meats for exportation, approved August thirtieth, eighteen hundred and ninety, and of an act to provide for the inspection of live cattle, hogs, and the carcasses and products thereof which are the subjects of interstate commerce, approved March third, eighteen hundred and ninety-one, and of amendment thereto approved March second, eighteen hundred and ninety-five, which are applicable to the subjects and purposes described in this section shall apply to process or renovated butter. And the Secretary of Agriculture is hereby authorized and required to cause a rigid sanitary inspection to be made, at such times as he may deem proper or necessary, of all factories and storehouses where process or renovated butter is manufactured, packed, or prepared for market, and of the products thereof and materials going into the manufacture of the same. All process or renovated butter and the packages containing the same shall be marked with the words 'Renovated Butter' or 'Process Butter' and by such other marks, labels, or brands and in such manner as may be prescribed by the Secretary of Agriculture, and no process or renovated butter shall be shipped or transported from its place of manufacture into any other state or territory or the District of Columbia, or to any foreign country, until it has been marked as provided in this section. The Secretary of Agriculture shall make all needful regulations for carrying this section into effect, and shall cause to be ascertained and reported from time to time the quantity and quality of process or renovated butter manufactured, and the character and the condition of the material from which it is made. And he shall also have power to ascertain whether or not materials used in the manufacture of said process or renovated butter are deleterious to health or unwholesome in the finished product, and in case such deleterious or unwholesome materials are found to be used in product intended for exportation or shipment into other states or in course of exportation or shipment he shall have power to confiscate the same. Any person, firm, or corporation violating any of the provisions of this section shall be deemed guilty of a misdemeanor and on conviction thereof shall be punished by a fine of not less than fifty dollars nor more than five hundred dollars or by imprisonment not less than one month nor more than six months, or by both said punishments, in the discretion of the court."

The act approved March 3, 1891, c. 555, 26 Stat. 1090, as amended by Ag. Ap. bill, approved March 2, 1895, c. 169, 28 Stat. 732 [U. S. Comp. St. 1901, p. 3190] (Public No. 555), being "An act to provide for the inspection of live cattle," etc., provides in section 1 for

the inspection of all cattle, etc., intended for export to foreign countries from the United States, and in section 2 for a careful inspection of all live cattle, the meat of which is intended for exportation to any foreign country.   Section 3 of such act reads as follows:

"Sec. 3. The Secretary of Agriculture shall cause to be inspected, prior to their slaughter, all cattle, sheep, and hogs which are subjects of interstate commerce and which are about to be slaughtered at slaughterhouses, canning, salting, packing, or rendering establishments in any state or territory, the carcasses or products of which are to be transported and sold for human consumption in any other state or territory or the District of Columbia, and in addition to the aforesaid inspection, there may be made in all cases where the Secretary of Agriculture may deem necessary or expedient, under the rules and regulations to be by him prescribed, a post-mortem examination of the carcasses of all cattle, sheep, and hogs, about to be prepared for human consumption at any slaughterhouse, canning, salting, packing, or rendering establishment in any state or territory or the District of Columbia, which are the subjects of interstate commerce."

Section 4 of the act, as amended, reads as follows:

"Sec. 4. That said examination shall be made in the manner provided by rules and regulations to be prescribed by the Secretary of Agriculture, and after said examination the carcasses and products of all cattle, sheep, and swine found to be free of disease and wholesome, sound, and fit for human food shall be marked, stamped, or labeled for identification as may be provided by said rules and regulations of the Secretary of Agriculture.  Any person who shall forge, counterfeit, simulate, imitate, falsely represent, or use without authority, or knowingly and wrongfully alter, deface, or destroy any of the marks, stamps, or other devices provided for in the regulations of the Secretary of Agriculture, of any such carcasses or their products, or who shall forge, counterfeit, simulate, imitate, falsely represent, or use without authority, or knowingly and wrongfully alter, deface, or destroy any certificate or stamp provided in said regulations, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding one thousand dollars, or imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.  The Secretary of Agriculture is hereby authorized to make such rules and regulations as he may decide to be necessary to prevent the transportation from one state or territory or the District of Columbia into any other state or territory or the District of Columbia, or to any foreign country, of the condemned carcasses or parts of carcasses of cattle, sheep, and swine, which have been inspected in accordance with the provisions of this act.  Any person, company, or corporation owning or operating any such slaughterhouse, abattoir, or meat curing, packing, or canning establishment, or any employee of the same, that shall willfully violate any provision of this act shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished for each offense by a fine not exceeding one thousand dollars or imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

It will be noted that section 3 of the act of March 3, 1891, provides for the inspection prior to slaughter of all cattle, sheep and hogs which are the subject of interstate commerce, and which are about to be slaughtered at certain establishments in any state or territory of the United States, and the carcasses or products of which are to be transported and sold for human consumption in any other state or territory than the one in which such cattle, etc., are slaughtered.  A post mortem examination of the carcasses of such animals about to be prepared for human consumption at such places may also be made when same are the subjects of interstate commerce.  This examination is to be made in the manner provided by

rules and regulations to be prescribed by the Secretary of Agriculture, and after such examination such carcasses and products as are found to be free of disease, wholesome, sound, and fit for human food are to be marked, stamped, or labeled for identification in such manner as may be provided by the rules and regulations of the Secretary of Agriculture. Evidently it was the purpose of Congress to provide for an inspection and an examination of all such animals, and of the meat, etc., of all such animals, intended for human food, and either made or intended to be made the subject of interstate commerce. Section 4 clearly provides for the marking, stamping, or labeling of these products, and the purpose of such marking, stamping or labeling is declared to be the identification of such meats or products. Evidently the means of identification, to wit, the marks, stamps, or labels, are to attend, go with, and be attached to these meats or products until they have reached the hands of the consumer. If not, the law would be complied with by merely marking, stamping, or labeling these meats or products; and the purchaser or manufacturer would be at liberty to remove, cancel, or destroy the marks, stamps, or labels immediately thereafter, or at any time when he desired to transfer the title thereto to another person, and keep such person in ignorance of the fact that the meats or products had been subject to the inspection and examination above referred to, and were or had been the subjects of interstate commerce. Section 4 declares, among other things, that any person who shall knowingly and wrongfully alter, deface, or destroy any of the marks, stamps, or other devices provided for in the regulations of the Secretary of Agriculture, of any such carcasses or other products, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by a fine not exceeding $1,000, or imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

These marks, stamps, or labels kept upon the meat products referred to will tell to the officers of the government and to all dealers whether or not such products have been properly inspected and examined, and whether or not they are or have been subjects of interstate commerce. Such marks, etc., will also tell whether or not such meats have been approved by the proper authorities as fit for human consumption. They will also enable the government to follow and identify such meats, etc., if for any reason such action becomes necessary. Section 5 of the oleomargarine act, approved May 9, 1902, and above quoted, has made the provisions of the above act approved March 3, 1891, as amended, applicable to process or renovated butter, and has provided that the Secretary of Agriculture shall cause a rigid sanitary inspection to be made of all factories and storehouses where process and renovated butter is manufactured, packed, or prepared for market, and of the products thereof, and of all materials going into the manufacture of same. The oleomargarine act also provides that:

"All process or renovated butter and the packages containing the same shall be marked with the words 'Renovated Butter' or 'Process Butter' and by such other marks, labels or brands and in such manner as may be prescribed by the

Secretary of Agriculture, and no process or renovated butter shall be shipped or transported from its place of manufacture into any other state or territory or the District of Columbia, or to any foreign country, until it has been marked as provided in this section."

The oleomargarine act, approved May 9, 1902, not only provides that renovated butter and the packages containing the same shall be marked with the words "Renovated Butter" or "Process Butter," but that it shall not be transported or shipped into any state or territory, or any foreign country other than that of its manufacture, until it has been so marked. Section 5 of that act also imposes a penalty for the shipment, transportation, or removal of such renovated butter to another state or territory, if such provision for marking or labeling shall not have been complied with.

Congress evidently had a purpose in providing in section 5 that all parts of the act for an inspection of meats, etc., and above referred to, applicable to the subjects and purposes described in the oleomargarine act, should apply to process or renovated butter. The provisions in the oleomargarine act providing for inspection and the making of needful rules and regulations for carrying the act into effect, etc., correspond, as to purpose, etc., with the provisions of sections 1, 2, and 3 of the act for inspection of live cattle, etc., approved March 3, 1891, and as subsequently amended. In the oleomargarine act we find no provision making it a criminal offense to forge, counterfeit, etc., or to knowingly and wrongfully alter, deface, or destroy, any of the marks, stamps, or other devices provided for in the regulations of the Secretary of Agriculture or in the law; but we must conclude, and it is evident, that there is as much necessity for such a provision in regard to renovated or process butter as in reference to meats, etc., intended for human consumption. Butter is used largely for human food, and the act bears on its face abundant evidence that one of its purposes is to prevent the interstate transportation and sale of process or renovated butter unless properly stamped, labeled, etc.

Is it necessary, proper, or advisable that the stamps, marks, labels, etc., upon renovated or process butter, or the packages containing same, shall not be removed, altered, or defaced until such article has reached the hands of the consumer? Evidently so. Otherwise, at any time after the process or renovated butter has left the factory, on its way to another state or territory, the labels and marks may be removed with impunity; and especially after such renovated butter has reached another state is the person transporting it at liberty to remove all such marks. Its identity as process or renovated butter is then destroyed, and it may be sold and resold in the state or territory to which shipped as genuine butter, or, as applied to this case, the renovated butter, manufactured in Ohio, and being a subject of interstate commerce, and having entered into interstate commerce, having been shipped to and received in the state of New York by a dealer in butter, and not a consumer, is, with the marks removed, placed upon the market as genuine butter, and, with the marks to identify it as process or renovated

butter removed, may be transported to the state of Connecticut, or any other state, or to a foreign country, as genuine butter. If the marks, etc., "for identification," have been removed, the government cannot follow it, even while remaining an article of interstate commerce. If such stamps, labels, etc., may be removed, then the purpose of the law, aside from the payment of the original tax imposed upon such a product, is absolutely defeated. It is evident that Congress intended to incorporate and has incorporated into the oleomargarine law the act approved May 9, 1902, section 4 of the act approved March 3, 1891, being "An act to provide for the inspection of live cattle, hogs, and the carcasses and products thereof, which are the subjects of interstate commerce, and for other purposes," as amended, so far as applicable, and section 4, as amended, is applicable and pertinent and necessary to carry into full force and effect the purpose of the oleomargarine law, which applies to renovated or process butter. Applying the provisions of section 4 of the act of March 3, 1891, as amended, to the oleomargarine law, and we would have that section incorporated therein read as follows:

"That said examination shall be made in the manner provided by rules and regulations to be prescribed by the Secretary of Agriculture, and after said examination all process or renovated butter found to be wholesome, sound and fit for human food shall be marked, stamped or labeled for identification as may be provided by said rules and regulations of the Secretary of Agriculture. Any person who shall forge, counterfeit, simulate, imitate, falsely represent or use without authority or knowingly and wrongfully alter, deface or destroy any of the marks, stamps or other devices provided for in the regulations of the Secretary of Agriculture of any such process or renovated butter, or who shall forge, counterfeit, simulate, imitate, falsely represent or use without authority, or knowingly and wrongfully alter, deface or destroy any certificate or stamp provided in said regulations, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding one thousand dollars or imprisonment not exceeding one year, or by both said punishments, in the discretion of the court. * * *"

Substantially the only change necessary to be made in section 4 in order to adapt it to the oleomargarine act is to strike out the words "carcasses or other products" wherever they occur, and insert in lieu thereof the words "process or renovated butter."

It seems to this court self-evident that the plain intent and purpose of Congress was to make it a criminal offense and punishable to forge, counterfeit, simulate, imitate, falsely represent, or use without authority, or knowingly and wrongfully alter, deface, or destroy, any of the marks, stamps, or other devices provided for in the regulations of the Secretary of Agriculture of any process or renovated butter, or to forge, counterfeit, simulate, imitate, falsely represent, or use without authority, or to knowingly and wrongfully alter, deface, or destroy, any certificate or stamp provided in said regulations, and to declare either of such offenses a misdemeanor, and to provide a punishment on conviction by a fine not exceeding $1,000, or imprisonment not exceeding one year, or both, in the discretion of the court. Instead of incorporating the language of the act of March 3, 1891, as amended March 2, 1895, into

the oleomargarine law, said act was referred to, and it is explicitly provided that:

"All parts of an act providing for the inspection of meats for exportation, approved August 30, 1890, and of an act to provide for the inspection of live cattle, hogs, and the carcasses and products thereof, which are the subjects of interstate commerce, approved March 3, 1891, and of the amendment thereto approved March 2, 1895, which are applicable to the subjects and purposes described in this section, shall apply to process or renovated butter."

It follows necessarily that if the purposes of the oleomargarine law are substantially the same as the purposes of the meat and cattle inspection law, above referred to, the provision above referred to, making it a crime to remove or deface the stamps, marks, etc., has been incorporated in, and must be read into and as a part of, the oleomargarine law. Congress is not supposed to have used the language it did in section 5 of the oleomargarine act without a purpose, and the language used either incorporates the criminal provisions referred to into that act, or fails to incorporate any part of the cattle and meat inspection law into the oleomargarine act; and the language of section 5, referred to, becomes meaningless and inoperative.

Section 4 of the oleomargarine act, among other things, provides:

"* * * And that upon process or renovated butter, when manufactured or sold or removed for consumption or use, there shall be assessed and collected a tax of one-fourth of one cent per pound, to be paid by the manufacturer thereof, and any fractional part of a pound shall be taxed as a pound. The tax to be levied by this section shall be represented by coupon stamps, and the provisions of existing laws governing engraving, issuing, sale, accountability, effacement, and destruction of stamps relating to tobacco and snuff, as far as applicable, are hereby made to apply to the stamps provided by this section."

Without going in detail into the provisions of law relating to the affixing of stamps, etc., and the cancellation thereof, it is sufficient to call attention to section 3364 of the Revised Statutes [U. S. Comp. St. 1901, p. 2202], which provides for the affixing of a label to each package of tobacco or snuff manufactured; and such section also provides that:

"Every manufacturer of tobacco who neglects to print on or affix such label to any package containing tobacco made by or for him, or sold or offered for sale by or for him, and every person who removes any such label so affixed from any such package, shall be fined fifty dollars for each package in respect to which such offense shall be committed."

See, also, sections 3373, 3374 [U. S. Comp. St. 1901, p. 2206].

The act of June 6, 1896, c. 337, 29 Stat. 255 [U. S. Comp. St. 1901, p. 2239] entitled "an act defining cheese, and also imposing a tax upon and regulating the manufacture, sale, importation and exportation of filled cheese," contains the following section (section 9):

"That upon all filled cheese which shall be manufactured there shall be assessed and collected a tax of one cent per pound, to be paid by the manufacturer thereof; and any fractional part of a pound in a package shall be taxed as a pound. The tax levied by this section shall be represented by coupon stamps; and the provisions of existing laws governing the engraving,

issue, sale, accountability, effacement and destruction of stamps relating to tobacco and snuff, as far as applicable, are hereby made to apply to stamps provided for by this section."

This provision incorporating into that law the existing provisions of law governing the engraving, issue, sale, accountability, effacement and destruction of stamps relating to tobacco and snuff was made the subject of discussion by the Supreme Court of the United States in Cornell v. Coyne, 192 U. S. 418, 24 Sup. Ct. 383, 48 L. Ed. 504. Both in the opinion of the court by Mr. Justice Brewer, and in the dissenting opinion by Mr. Justice Harlan, that section and its effect are discussed; and it is nowhere suggested that the language of section 9 of the filled-cheese act does not fully incorporate therein the provisions of existing law relating to the engraving and effacement and destruction of stamps on packages of tobacco and snuff.

In the opinion of this court, the provisions of law referred to are effectively incorporated in the oleomargarine law, and are to be read and enforced as a part thereof.

But for section 1 of the act, process or renovated butter would remain an article and subject of interstate commerce until it had reached the hands of some purchaser, in the state to which carried, other than the general dealer importing it for sale only. How far section 1 operates to permit the purchaser of process or renovated butter, who has removed it to a state other than the one where manufactured, to "treat it as his own," or "do with it and the packages in which contained as he likes," is a necessary subject of inquiry. Section 1 reads:

"That all articles known as oleomargarine, butterine, imitation, process, renovated, or adulterated butter, or imitation cheese, or any substance in the semblance of butter or cheese not the usual product of the dairy and not made exclusively of pure and unadulterated milk or cream, transported into any state or territory or the District of Columbia, and remaining therein for use, consumption, sale, or storage therein, shall, upon the arrival within the limits of such state or territory or the District of Columbia, be subject to the operation and effect of the laws of such state or territory or the District of Columbia, enacted in the exercise of its police powers to the same extent and in the same manner as though such articles or substances had been produced in such state or territory or the District of Columbia, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise."

This court is not prepared to assent to the claim that this section wholly divests the articles named therein, including process or renovated butter, of their character as subjects of interstate commerce, immediately on their arrival in a state other than that of their production, at least to such an extent as to permit the removal of all marks, labels, etc., required by the national law to be affixed when a subject of interstate commerce. Marked and labeled by order of the general government "for identification" and stamped, the tax having been paid, the process or renovated butter so marked or labeled is distinguishable from all other. Other process or renovated butter made in the same factory, and equally subject to the law, but not inspected, marked, labeled, or stamped, may be shipped into another state at the same time. Has

the general government lost jurisdiction over the latter because of section 1 of the act in question? May not the government officials follow it? Can inspection or tax or both be avoided by shipping it over the border of the state? Has not the government marked and labeled, or caused to be marked and labeled, that which was examined and inspected, and on which the tax was paid, for purposes of identification—for the purpose of distinguishing it from that not inspected and examined, and on which the tax has not been paid? Has not the government the right to demand that such marks and labels and stamps shall remain until the article reaches the ultimate consumer, or at least until it has passed to a purchaser in the state to which taken, and has become commingled in the common mass of property in the state? Does not the purchaser who takes the article from one state to another take it with knowledge of the law, and does he not assent to the proposition that such marks, etc., shall remain?

It is true that section 1 of this act is substantially the same as a similar section in what was known as the "Wilson Bill," and which was made the subject of examination and decision by the Supreme Court of the United States in In re Rahrer, 140 U. S. 545, 11 Sup. Ct. 865, 35 L. Ed. 572. In that case the court said (page 560, 140 U. S., page 868, 11 Sup. Ct., 35 L. Ed. 572):

"Congress has now spoken, and declared that imported liquors or liquids shall, upon arrival in a state, fall within the category of domestic articles of a similar nature."

And again (page 562, 140 U. S., page 869, 11 Sup. Ct., 35 L. Ed. 572):

"No reason is perceived why, if Congress chooses to provide that certain designated subjects of interstate commerce shall be governed by a rule which divests them of that character at an earlier period of time than would otherwise be the case, it is not within its competency to do so."

As early as the decision of Brown v. Maryland, 12 Wheat. 419, 6 L. Ed. 678, it was held that interstate commerce could not be stopped at the external boundaries of the state, but must enter the interior of the state, and includes a sale therein. This power to sell, as a part of interstate commerce, was applied in that case to foreign commerce, but Chief Justice Marshall said the power would be the same as applied to commerce between the states.

In Schollenberger v. Pennsylvania, 171 U. S., at page 23, 18 Sup. Ct. 765, 43 L. Ed. 49, the court said:

"In the absence of congressional legislation, therefore, the right to import a lawful article of commerce from one state to another continues until a sale in the original package in which the article was introduced into the state."

Without going into the numerous cases bearing to some extent, even though indirectly, on the question, this court is of the opinion that in making process or renovated butter transported into a state, and remaining therein for use, consumption, sale, or storage therein, subject on arrival in such state to the operation and effect of the laws of such state enacted in the exercise of its police power to the same extent and in the same manner as though such articles

had been produced in such state, and declaring that same shall not be exempted from such laws by reason of being introduced into such state in original packages or otherwise, Congress did not intend to confer any power and has not conferred any power on any person to remove the marks, labels, stamps, etc., from process or renovated butter. When the packages are used, the marks, stamps, etc., are to be destroyed. New York has passed no law allowing this to be done, and it is not seen that such a law could be passed in the legitimate exercise of the police power of the state. Section 1 of the oleomargarine act was not intended to abrogate any penalty imposed for the violation of the penal provisions referred to, or to permit the acts therein forbidden, or to empower a state to make any law interfering with the operation of such laws, unless there should arise a conflict between the laws of the United States and those of the state passed in the legitimate exercise of its police power. It is perfectly clear that to permit the removal of the stamps, marks, labels, etc., on packages of a food product of this character, and specifically authorized by law, while such articles remain an article of interstate commerce, or even thereafter, when we consider the objects and purposes of the law, would not only defeat the objects and purposes of the legislative body as to inspection, etc., but open the doors wide to frauds on the revenue. The placing of the marks, etc., on the packages, implies they are to remain.

Attention has been called to the proviso in the act of March 2, 1901, "An act making appropriations for the Department of Agriculture for the fiscal year ending June 30, 1902" (31 Stat. 926). That proviso reads as follows:

"That the Secretary of Agriculture may construe the provisions of the act of March third, eighteen hundred and ninety-one, as amended March second, eighteen hundred and ninety-five, for the inspection of live cattle and products thereof, to include dairy products intended for exportation to any foreign country, and may apply, under rules and regulations to be prescribed by him, the provisions of said act for inspection and certification appropriate for ascertaining the purity and quality of such products, and may cause the same to be so marked, stamped, or labeled as to secure their identity and make known in the markets of foreign countries to which they may be sent from the United States their purity, quality, and grade; and all the provisions of said act relating to live cattle and products thereof for export shall apply to dairy products so inspected and certified."

I find nothing in this proviso inconsistent with the views expressed. This proviso amplifies the power of the Secretary of Agriculture as to dairy products intended for exportation to any foreign country, but does not purport to limit the powers before granted by the acts to which attention has been invited. It has no possible reference to dairy products transported or to be transported from one state to another—interstate commerce, pure and simple.

It is not necessary here to recite the rules and regulations of the Secretary of Agriculture duly made and promulgated pursuant to and by virtue of the statutes above quoted. It is sufficient to say that they are ample, in due form, and provide for coupon stamps to

be securely affixed to the side of the package and canceled. "Such stamps must contain the name of the collector, his district and state, and show thereon the date of payment of the tax, the number of pounds, and the number of the factory." Also for labels on each package, on which are to be printed the number of the factory, the revenue district and state in which situated, and also a notice containing the words "Renovated Butter" or "Process Butter," etc. These stamps, marks, or labels, and notices, affixed to packages of renovated butter at the factory in Ohio, were removed by the defendant after same reached the city of Binghamton, N. Y., where the packages were put in cold storage. The defendant purchased the goods in Ohio, brought them to New York for sale, where he removed all these stamps and marks, and thereafter sold same—such renovated butter—in New York.

The indictment states facts constituting a crime, and the demurrer thereto is overruled.