GIBBS v. McNEELEY et al.

(Circuit Court, D. Washington, W. D. June 8, 1900.)

**1. MONOPOLIES—ACTION UNDER ANTI-TRUST LAW—PLEADING.**

A complaint in a civil action, based on the anti-trust law of 1890, alleging an illegal combination by defendants in restraint of trade, is fatally defective, where it fails to show that plaintiff has suffered damage by reason of such combination.

**2. SAME—ILLEGAL COMBINATIONS WITHIN THE STATUTE—RIGHT OF ACTION FOR DAMAGES.**

An association of manufacturers of shingles within a particular state, formed for the purpose of securing concerted action between its members to prevent overproduction and establish uniform prices and grading, is not an illegal combination in restraint of interstate or foreign commerce, within the meaning of the anti-trust law of 1890, or subject to federal control; and the fact that through the action of the association the mills of its members were closed for a certain time, and the price of shingles was raised, but not to an extent alleged to be unreasonable or exorbitant, does not give a dealer in shingles for export a right of action against it or its members under such law.

**3. SAME.**

The action of an association of manufacturers in adopting a resolution denouncing a dealer in the product they manufactured, who bought and shipped such product to customers in other states and foreign countries, and in printing such resolution in circulars, and mailing the same to other manufacturers and customers of the dealer, whereby his business was injured, constituted an illegal combination or conspiracy in restraint of interstate and foreign commerce, and gives the person injured a right of action in a circuit court of the United States, under the anti-trust law of 1890, to recover the damages sustained.

Action to recover damages claimed on account of an unlawful combination to restrain interstate and foreign commerce, and a conspiracy on the part of the defendants to establish and control prices of the product of the mills employed in manufacturing red-cedar shingles, in the state of Washington, and to limit the production of red-cedar shingles so as to prevent demoralization of the market by overproduction, and also to recover damages alleged to have been caused by the defendants and others, forming an unincorporated association of shingle manufacturers under the name and style of the Washington Red-Cedar Shingle Manufacturers' Association, by the circulation through the mails and publication of false and defamatory statements concerning the plaintiff, and intended to injure him in his business as a buyer and exporter of red-cedar shingles. Demurrer to complaint overruled.

T. O. Abbott, for plaintiff.

Bates & Murray, for defendants.

HANFORD, District Judge. The plaintiff's amended complaint sets forth four separate causes of action. The material allegations to be considered may be condensed into a few sentences. The plaintiff shows that for several years he was engaged in business at Tacoma, in the state of Washington, as a buyer and exporter of red-cedar shingles; that red-cedar shingles are a staple article of manufacture in the state of Washington, the market for which is mostly in other states and in Canada; that the defendants, and other persons, firms,

and corporations named in the complaint, are manufacturers of red-cedar shingles, owning and operating mills in several different places in this state, and that they have formed and constitute an unincorporated association having for its object the prevention of injurious competition, and that the organization and maintenance of said association is in violation of the act of congress entitled "An act to protect trade and commerce against unlawful restraints and monopolies," approved July 2, 1890 (1 Sup. Rev. St. [2d Ed.] 762). For a second cause of action the complaint alleges, in addition to the matters already recited, that the association has established prices for red-cedar shingles below which members are not allowed to sell, said prices being a little higher than the market prices prior to the formation of the association; that the plaintiff's customers refused to buy at the prices fixed by the association, causing him damage in the loss of trade to the amount of $1,200. For a third cause of action the complaint alleges, as additional matter, that the association caused all the shingle mills owned and operated by its members to shut down for a period of 60 days for the purpose of preventing an oversupply, and that by restricting the production of red-cedar shingles the plaintiff sustained further damages by loss of trade to the amount of $1,000. For a fourth cause of action the plaintiff charges that the defendants and other members of the association, with intent to injure the plaintiff and to destroy his business, at a meeting of the central committee of the association, adopted certain resolutions containing false and defamatory statements concerning the plaintiff, charging that the plaintiff was endeavoring to injure the market for Washington red-cedar shingles; that plaintiff had no money invested in his business as a dealer in shingles; that he was without credit, and was irresponsible, and was not an honorable and legitimate dealer in shingles; that the officers of the association caused said resolutions containing said false and defamatory matters to be written and made a part of the records of the association, and caused the same to be printed as a circular, and to be distributed through the United States mails, addressed to each manufacturer of shingles in the state of Washington, and to various wholesale and retail dealers, including customers of the plaintiff in the United States and Canada, and to a number of newspapers and trade journals having circulation among the plaintiff's customers; that as the result of said combination and conspiracy among the defendants and other members of said association, and of the acts and things complained of, odium and discredit were cast upon the plaintiff, and his customers thereafter refused to buy shingles of him, and the manufacturers of shingles who theretofore had transacted business with him refused to sell shingles to him, and by that means his business was totally destroyed, to his damage in the sum of $15,000.

1. The complaint in its statement of the first cause of action is radically defective, in this: that it does not allege that any damage has resulted to the plaintiff from the acts complained of, and for that reason the demurrer will be sustained.

2. The gist of the second cause of action is that the plaintiff has been damaged by diminution of trade in consequence of the action of the association in raising the price of shingles; and the third cause of

action is smilar, the complaint being that a shrinkage of the plaintiff's business was caused by the action of the association in suspending the operation of mills controlled by it, so as to prevent an overstocking of the market. Both of these causes of action appear to be predicated upon a notion that because the plaintiff was a buyer and exporter of shingles he had a vested right to the benefit of unrestrained competition for trade among manufacturers, and that the plaintiff has a vested right at all times to have a surplus of shingles on the market so that he may enjoy that advantage in buying to supply the demands of his customers, and that by depriving him of these benefits and advantages the association has committed a legal wrong, and deprived him of valuable property rights, for which he is entitled to recover damages. There is no allegation in the complaint that the price of shingles fixed by the association is higher than the reasonable price, considering the necessary cost of production, and allowing something for the value of the timber to the owners of the land upon which it grows, and a reasonable profit to the manufacturers, nor that the wants of consumers have not been promptly supplied. On the contrary, the pleader has boldly advanced the selfish theory that, unless conditions are maintained so that a middleman or speculator may operate with profit to himself, he has a right to compensation in damages from the owners of mills who refuse to operate for his benefit, or to sell the product at prices satisfactory to him, regardless of losses which may result to them from such operation. It is a well-known and lamentable fact that for half a century loggers have been permitted to cull the magnificent forests of this state, wasting the greatest of her natural endowments, by cutting fir and cedar trees recklessly, sending only the best logs to the mills to be manufactured into lumber for shipment to market in distant states and countries, leaving the residue to decay upon the ground, or give additional energy to the destructive force of forest fires in the summer months. They have paid but little for stumpage, and frequently their hired laborers have been defrauded of their wages. Unrestrained competition has been the means by which this state has been stripped of its wealth. Cedar trees standing and growing in our forests are a blessing to the state, and they ought to be preserved, at least until their value is appreciated, so that the crop which has required many centuries of time for its perfection will be worth to owners of the land something more than the price which a farmer may reasonably expect for his annual production. It seems ridiculous that while land producing wheat, hay, vegetables, or fruit in this state usually brings annual returns over and above expenses of cultivating and harvesting of from $10 to $50 per acre, the average market price for a fee-simple title to timber land in western Washington has never yet been above $10 per acre. An association which will check the wanton destruction of cedar trees in this state, by reckless lumbermen, for the benefit of speculators, instead of being condemned, deserves the gratitude of the commonwealth. No principle of natural justice is appealed to by that part of the complaint now under consideration, and I do not think that the act of congress commonly designated as the "Anti-Trust Law of 1890," to which the complaint refers, can be fairly construed so as

to make the Washington Red-Cedar Shingle Manufacturers' Association a criminal organization, so long as its operations are properly conducted, and kept within the scope of the object for which the association was formed, as set forth in its constitution, the first article of which reads as follows:

"The title of this organization shall be the Washington Red-Cedar Shingle Manufacturers' Association, and its object shall be to secure a full understanding of the conditions surrounding the red-cedar shingle market throughout the United States; the establishing of uniform rules for grading and manufacturing; the establishing of uniform rates and prices; and for purpose of carrying out such other measures as may be deemed for the welfare and in the interest of the manufacturers of red-cedar shingles."

There is in this declaration no hint of a purpose to create a monopoly, or to place any burden upon interstate or foreign commerce. The association, judged by the instrument which defines its object and circumscribes its powers, is innocent of any wrong intent, because its object is to influence the conduct of its members, and not to assail the rights of others. Concert of action for mutual protection among farmers or craftsmen or miners whose operations are entirely within the state may indirectly affect the prices or the abundance of commodities brought for sale within the state by importers, as well as commodities produced within the state for sale elsewhere; but associations of persons not themselves engaged in interstate commerce, having no object other than to protect their own rights and serve their own interests in business operations wholly confined within the state, cannot be held to be amenable as violaters of the anti-trust law, which is necessarily so limited as to reach only combinations intended to prevent competition in interstate or foreign commerce.

The distinction between the business of manufacturing staple commodities for sale to whomsoever will buy, whether for home consumption or transportation to distant markets, and interstate commerce, is very clearly brought into view, and the principle upon which I intend to rest in making this decision is explained, in the opinion by Chief Justice Fuller in the case of U. S. v. E. C. Knight Co., 156 U. S. 1–11, 15 Sup. Ct. 253, 39 L. Ed. 329. The sense of that decision is epitomized in the following excerpts:

"The relief of the citizens in each state from the burden of monopoly and the evils resulting from the restraint of trade among such citizens was left with the states to deal with, and this court has recognized their possession of that power even to the extent of holding that an employment or business carried on by private individuals, when it became a matter of such public interest and importance as to create a common charge or burden upon the citizen,—in other words, when it becomes a practical monopoly, to which the citizen is compelled to resort, and by the means of which a tribute can be exacted from the community,—is subject to regulation by state legislative power. On the other hand, the power of congress to regulate commerce among the several states is also exclusive. The constitution does not provide that interstate commerce shall be free, but, by the grant of this legislative power to regulate it, it was left free except as congress might impose restraints. * * * 'Commerce undoubtedly is traffic,' said Chief Justice Marshall; 'but it is something more; it is intercourse. * * * That which belongs to commerce is within the jurisdiction of the United States, but that which does not belong to commerce is within the jurisdiction of the police power of the state.' Gibbons v. Ogden, 9 Wheat. 189–210, 6 L. Ed. 23; Brown v. Maryland, 12 Wheat. 419-448, 6 L. Ed. 678; License Cases, 5 How. 505-599, 12 L. Ed. 256;

Mobile Co. v. Kimball, 102 U. S. 691, 26 L. Ed. 238; Bowman v. Railway Co.. 125 U. S. 465, 8 Sup. Ct. 689, 1062, 31 L. Ed. 700; Leisy v. Hardin. 135 U. S. 100, 10 Sup. Ct. 681, 34 L. Ed. 128; In re Rahrer, 140 U. S. 545–555, 11 Sup. Ct. 865, 35 L. Ed. 572. * * * Doubtless the power to control the manufacture of a given thing involves, in a certain sense, the control of its disposition, but this is a secondary, and not a primary, sense; and, although the exercise of that power may result in bringing the operation of commerce into play, it does not control it, and affects it only incidentally and indirectly. Commerce succeeds to manufacture, and is not a part of it. * * * The regulation of commerce applies to the subjects of commerce, and not to matters of internal police. Contracts to buy, sell, or exchange goods to be transported among the several states, the transportation and its instrumentalities, and articles bought, sold, or exchanged for the purpose of such transit among the states, or put in the way of transit, may be regulated, but this is because they form part of interstate trade or commerce. The fact that an article is manufactured for export to another state does not of itself make it an article of interstate commerce, and the intent of the manufacturer does not determine the time when the article or product passes from the control of the state, and belongs to commerce. * * * Contracts, combinations, or conspiracies to control domestic enterprise in manufacture, agriculture, mining, production in all its forms, or to raise or lower prices or wages, might unquestionably tend to restrain external as well as domestic trade; but the restraint would be an indirect result, however inevitable and whatever its extent, and such result would not necessarily determine the object of the contract, combination, or conspiracy. * * * It was in the light of well-settled principles that the act of July 2, 1890, was framed. Congress did not attempt thereby to assert the power to deal with monopoly directly as such, or to limit and restrain the right of corporations created by the states or citizens of the states in the acquisition, control, or disposition of property, or to regulate or prescribe the price or prices at which such property or the product thereof should be sold, or to make criminal the acts of persons in the acquisition and control of property which the states of their residence or creation sanctioned or permitted."

See, also, Kidd v. Pearson, 128 U. S. 1–26, 9 Sup. Ct. 6, 32 L. Ed. 346.

The more recent decision of the supreme court in the case of Addyston Pipe & Steel Co. v. U. S., 175 U. S. 211–248, 20 Sup. Ct. 96, Adv. S. U. S. 96, 44 L. Ed. ——, does not conflict with the decisions above cited. That case is to be distinguished from the one under consideration by the fact that it involved an agreement between manufacturing firms and corporations located in several states, binding themselves to refrain from all competition with each other for the sale of iron pipe in the 36 states and territories named in the agreement.

The history of the hop industry in this state may be referred to as an illustration. There was a time when the production of hops was a favorite industry in this state, but during several years past it has grown more and more into disfavor because it has been unprofitable, and interstate commerce in this commodity has been diminished by reason of the conversion of many hop fields into meadows and vegetable gardens. It may be true that the hop farmers, acting individually and without advice from any one, have, one after another, converted their hop fields; but if they had joined an association of farmers who for general welfare had adopted efficient measures to obtain true information with regard to the supply and demand for hops and other products of the state, and had conformed to an intelligent resolution of the association to meet an increasing demand for onions, potatoes, and hay, instead of continuing to lose the value of their labor and the use of their farms, year after year, by producing

hops in excess of the requirements of the market, it would certainly be tyrannical for the courts to punish them for resulting losses of profit by dealers and speculators in hops. In my opinion, it would be equally absurd to apply coercive measures to compel shingle manufacturers to operate their mills without profit to themselves, or to forbid them to have the benefit of co-operation for their own advantage. The demurrer to the second and third affirmative defenses will be sustained on the ground that the object of the association is not unlawful. The anti-trust law was not intended to oppress any class, and it cannot be so construed as to prohibit the right of manufacturers, whether acting individually or in concert, to be prudent, and use common sense in maintaining reasonable prices, and avoiding losses by overproduction.

3. According to the statement of the fourth cause of action, the association appears to have been used for a purpose not suggested by its constitution, and highly prejudicial to the plaintiff. In my opinion the complaint states a good cause of action to recover damages for libel, and the only question as to the right of the plaintiff to maintain the action in this court is whether the facts alleged make a case of which jurisdiction is given to this court by the terms of the anti-trust law. The first and second sections of the act declare contracts, combinations, and conspiracies in restraint of trade or commerce among the several states or with foreign countries, and all attempts of persons to monopolize interstate and foreign commerce, to be illegal, and the seventh section reads as follows:

"Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act, may sue therefor in any circuit court of the United States in the district in which the defendant resides or is found, without respect to the amount in controversy, and shall recover threefold the damages by him sustained and the costs of suit, including a reasonable attorney's fee."

It is essential to a right of action pursuant to this law to show that the defendants have entered into a combination or conspiracy to restrain or monopolize interstate or foreign commerce, and that the plaintiff has been injured in his business or property by an act of the defendants pursuant to their agreement with each other, and intended to affect interstate commerce, and the injury must be of a pecuniary nature, involving a loss of business or damage to property. I find that all the requirements of the statute are met in the plaintiff's statement of his fourth cause of action. He does directly and positively charge that the defendants have entered into a combination to restrain interstate and foreign commerce, and constitute an organization; that at a meeting of the central committee, controlling the affairs of the association, a resolution denouncing the plaintiff was adopted, and recorded, so as to be preserved in the records of the association; that said resolution was printed and widely distributed as a circular, and especially directed to persons, firms, and corporations in the state of Washington, and in other states, and in Canada, with whom the plaintiff had theretofore transacted business as a buyer and exporter of shingles. The resolution was obviously intended to create a prejudice against the plaintiff, and to have the effect to impair his credit,

and to destroy his business, by inducing his customers to forsake him; and the complaint alleges that the plaintiff has been injured in his business by reason of what the defendants have done in pursuance of their unlawful combination against his business. The resolution is not a regulation of the conduct of the association or its members, and they were not minding their own business when they adopted it, but is an agreement on their part to assail the character of a man engaged in interstate commerce, for the purpose of crippling him as a competitor for trade. By annihilating a man of experience and skill in a particular branch of commerce, the restraint upon commerce is quite as effectual as would be any contract binding him to abstain from competition.

Demurrer to fourth cause of action overruled.