THE TEXAS CO. (P. R.) INC., Petitioner, *v.* TAX COURT OF PUERTO RICO, Respondent; SOL LUIS DESCARTES, ETC., Intervener.

No. 262. Resubmitted December 11, 1957.—Decided March 2, 1961.

130

*James R. Beverley, R. Rodríguez Lebrón* and *Carmen B. Hernández* for petitioner. *Víctor Gutiérrez Franqui, Attorney General,* and *J. B. Fernández Badillo, Assistant Attorney General,* for intervener, defendant in the main action.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

The Texas Co. (P.R.) Inc. filed a petition in the instant case to review a judgment of the former Tax Court of Puerto Rico upholding the refusal of the then Treasurer of Puerto Rico to refund $5,494.08 as taxes paid on a certain amount of gallons of illuminating oil (kerosene) brought by boat to Puerto Rico from the Dutch isle of Aruba.

The case was submitted to the trial court on the basis of the facts agreed to in two stipulations of the parties, complemented with the documents regarding the previous administrative procedure and a deposition of Mr. Richard B,

Polk, and on the basis of the legal issues set forth in the allegations.

In the first stipulation, prior to the amended complaint, it was textually agreed:

"1. That on January 18, 1948, the SS "Fort Lane" arrived at Pier No. 13 of the city of San Juan, bringing a cargo of kerosene proceeding from Aruba.

"2. That the total amount of kerosene being brought by said vessel upon its arrival in Puerto Rico on January 18, 1948, which amount was consigned to this Island, was 715,943 gallons of kerosene at 60°, equivalent to 723,831 gallons at natural temperature.

"3. That of said total amount of kerosene consigned to Puerto Rico, as a matter of fact, 528,460 gallons of kerosene at 60°, equivalent to 534,282 gallons at natural temperature, were deposited in the tanks of the gasoline companies, for which total amount the gasoline companies, The Texas Co., The Shell Co., and The Standard Oil Co., paid to the Treasurer, as evidenced by the receipts of taxes paid, photostatic copies of which are attached hereto.

"4. That of the total cargo of kerosene consigned to Puerto Rico a certain amount is deducted, as is usual and common in every shipment. From experience said decrease is estimated at .008859303, as the average maritime loss suffered in previous shipments, and that in this case it comes to 6,343 gallons of kerosene at 60°, equivalent to 6,413 gallons at natural temperature.

"5. That when the SS "Fort Lane" was pumping the kerosene into the tanks of the petitioner through the pipes provided therefor, there occurred a loss of 181,140 gallons of said product at 60°, equivalent to 183,136 gallons at natural temperature, which product was lost into the sea and in the vicinity of Pier No. 13.

"6. That the said loss of 183,136 gallons of kerosene at natural temperature was due to the negligence of the dock foreman, an employee of the plaintiff who, being responsible for the proper operation of the receiving lines or pipes of the plaintiff, left partially open plaintiff's valve to receive kerosene located in Pier No. 13, and who also failed to attach the blind flange to the valve as an added measure of security.

"7. That the total loss suffered by The Texas Co. (P.R.) Inc. and for which it paid the excises the refund of which it requests, amounts to 181,140 gallons at 60°, equivalent to 183,136 gallons at natural temperature."

And in the second stipulation, subsequent to said amended complaint:

"1. That when the loss of kerosene referred to in the complaint filed in this case took place, Mr. Angel M. Pacheco Padró, at that time an internal revenue agent assigned to the Bureau of Excise Taxes of the Department of Finance, was present at the site of the loss and became fully aware of the said loss and of the causes thereof although at the time he was unable to determine the exact amount of kerosene lost.

"2. That the attached copies of the letter of April 19, 1948, addressed by the Honorable Treasurer of Puerto Rico to counsel for the plaintiff, as well as the copy of the Petition for Refund dated April 9, 1948, filed by counsel for the plaintiff in the office of the Treasurer of Puerto Rico, are all true copies of their originals.

"3. That the attached copy of the Internal Revenue Invoice to the effect that the excises were paid is an original copy of that invoice, and that no copies thereof are attached to the remaining copies of this Stipulation, by agreement of the parties hereto.

"4. The parties incorporate hereto by reference all other documents contained in the record of this case, specifically including Mr. Richard B. Polk's deposition, as well as the foregoing stipulation between the parties, dated January 18, 1949."

The main questions of law raised in the trial court were:

1. Whether The People of Puerto Rico had power at law to levy and collect internal-revenue taxes taking as a taxable event the mere introduction or importation of goods into the Island, and

2. Whether the illuminating oil brought to Puerto Rico by the petitioner was exempt from such taxes pursuant to the provisions of Act No. 426 of May 14, 1947.

The Tax Court entered judgment dismissing the amended complaint for the refund of excise taxes. The grounds therefor were set forth in a lengthy and careful opinion in which the conclusion arrived at was to the effect that The People of Puerto Rico had full constitutional power to levy and collect said taxes upon introduction or importation into Puerto Rico from the United States or from foreign countries without taking into consideration the final disposition of the article taxed, and as to the question of the tax exemption, that the plaintiff had not first exhausted the administrative remedies nor given the Treasurer an opportunity to decide the issue.

Before us the petitioner assigns the following errors as committed by the trial court:

"A. The Tax Court of Puerto Rico erred in deciding that the power of Puerto Rico to levy a tax on articles not produced locally as soon as said articles are imported into the Island, whether they proceed from the United States or a foreign country, was established on March 4, 1927, by the Butler Act, amending § 3 of the Organic Act, in the sense of making the mere introduction or importation a taxable event. The Congress of the United States did not give this power to Puerto Rico and our Legislature can not levy an import tax on merchandise introduced into Puerto Rico.

"B. The Tax Court of Puerto Rico erred in deciding that the United States Congress in the use of its power to legislate for territories, made of the mere importation into Puerto Rico an event locally taxable, and in deciding that it is a constitutionally valid act of the Legislative Assembly to levy a tax on the kerosene introduced into Puerto Rico without any further taxable event such as, for example, the use or consumption or disposition thereof within the Island.

"C. The Tax Court of Puerto Rico erred in deciding that said power was judicially established by the decision of the Supreme Court of the United States in *West India Oil Co.* v. *Domenech,* 311 U.S. 20.

"D. The Tax Court of Puerto Rico erred in deciding that there had been an introduction or importation into Puerto Rico of the kerosene involved in this suit, for the purposes of the Internal Revenue Law. Assuming that by virtue of the Butler

Act the Legislature of Puerto Rico had been authorized to levy a tax as soon as a specific merchandise is introduced into the Island, the process of the introduction thereof must necessarily be completed. . In the case at bar, during the process of delivery, and without the product having been landed, approximately 200,000 gallons of kerosene were lost, wherefore the taxable event was not consummated, and the tax provided by the statute can not be levied thereon.

"E. The Tax Court of Puerto Rico erred in refusing to order the refund of the taxes sought under the provisions of Act No. 426, enacted May 14, 1947 (§ 16–C of the Internal Revenue Law)."

The petitioner argues the first three errors jointly. We shall dispose of them in like manner.

## I

 The petitioner is a domestic corporation devoted, since its organization, "to the importation and purchase and sale of gasoline, kerosene, and other petroleum products", as it claims in its petition. On the night of January 17–18, 1948, it brought to Puerto Rico, in connection with its business, the kerosene shipment on which it paid the internal-revenue taxes the refund of which it claimed 82 days later. At that time the local internal-revenue statute under which the three-cent tax was levied and collected on each gallon of oil (Act No. 85 of August 20, 1925) provided, insofar as pertinent:

"Section 16. Articles subject to internal revenue tax.—There shall be collected and paid, once only, as an internal-revenue tax on the following articles and on the articles comprised in this section of the law sold, transferred, used or consumed in, or *introduced* into, Puerto Rico:

"1. . . . . . . . . . . . .

"2. . . . . . . . . . . . .

"29. Kerosene.—On all illuminating oils or substitute therefor, sold, transferred, used, or consumed in, or *introduced* into, Puerto Rico, a tax of three (3) cents a gallon."

"Section 37.—Dealers liable for tax.—Dealers shall be liable for the payment of the tax on all articles introduced by them

whether for sale, transfer, use or consumption, *upon introducing* or upon coming into possession of the article or articles in Puerto Rico, or on transferring the same to another dealer or a consumer after their introduction." (Italics ours.)

In accordance with those provisions the taxable events were then (and, in general, still are) the sale, transfer, use, and consumption in and the introduction into Puerto Rico of the articles listed in the law.

The power to tax the introduction of goods into Puerto Rico did not appear until March 4, 1927. When Congress initially gave The People of Puerto Rico legislative power to levy and collect internal-revenue taxes by virtue of § 3 of the Organic Act of 1917, the tax could not be levied and collected as soon as the article taxed had been introduced or imported into the Island. The lack of this power gave rise to no few practical difficulties and judicial controversies.[1]

On August 20, 1925, our Legislative Assembly enacted Act No. 85 "to provide revenues for The People of Porto Rico by levying certain sale taxes and taxes for the manufacture, use, sale and consumption of certain products and by the levying of certain excise and license taxes on certain occupations, industries or businesses". It was to be known as the "Internal Revenue Law of Porto Rico". In Title II, on Excise Taxes, Part I, composed of Section 16, it provided that there would be collected and paid certain internal-revenue taxes, once only, on certain specific articles mentioned in a long list.[2] In general, pursuant to its original context, the taxable events with regard to articles taxed were the sale, transfer, use or consumption thereof in Puerto Rico. But, taking into consideration past experience and diffi-

---

[1] On this point: *West India Oil Co.* v. *Gallardo,* 6 F.2d 523 (1925); Porto Rico Tax Appeals, 16 F.2d 545 (1926); Congressional Record, Vol. 67, Part 11, House, July 2, 1926, p. 12775.

[2] The original subdivision 29 referred to musical instruments; in 1927 it was amended to refer to jewelry and, finally, by Act No. 158 of May 13, 1941, it was amended to tax illuminating oil (kerosene).

culties and conscious of its lack of specific power to levy and collect taxes upon the importation into Puerto Rico of those articles, the Legislature provided in § 109 of that act:

"Section 109.—From and after the date on which the Congress of the United States ratifies this section, there shall be levied and collected by the Treasurer of Porto Rico on all articles enumerated in section 16 of this Act, *imported into Porto Rico from any state, territory or district of the United States or from foreign countries,* the same tax established by this Act for the manufacture or use of said articles or for dealing therein. Said tax shall be paid at *the time of the importation* of said articles which shall not be delivered to the consignee thereof until the payment of the tax, established in this section shall have been proven. Upon such payment the imported articles shall be exempt from all tax for the use thereof or for dealing therein." (Italics ours.)

That legislative action of ours was honestly, quickly, and effectively received by Congress. On May 13, 1926, Senator Butler introduced in the Federal Senate, Bill No. S–4247 to amend several sections of our Organic Act of 1917. Shortly thereafter Resident Commissioner Córdova Dávila introduced an identical bill under No HR-12269 in the House of Representatives. In February 1927, Senator Butler was no longer in Congress, but Senator Willis adopted as his own the bill in the Senate. It was finally approved on March 4, 1927, without any opposition and with slight amendments. By virtue thereof, the following paragraph was added to § 3 of the Organic Act:

"And it is further provided, That the internal-revenue taxes levied by the Legislature of Puerto Rico in pursuance of the authority granted by this Act on articles, goods, wares, or merchandise may be levied and collected as such Legislature may direct, on the articles subject to said tax, *as soon as the same are* manufactured, sold, used, or *brought into the Island;* Provided, That no discrimination be made between the articles imported from the United States or foreign countries and similar articles produced or manufactured in Puerto Rico.

*The officials of the Customs and Postal Services of the United States are hereby directed to assist the appropriate officials of the Puerto Rican government in the collection of these taxes."* (Italics ours.)

That same Act also added the following paragraph to its § 48:

"That no suit for the purpose of restraining the assessment or collection of any tax imposed by the laws of Puerto Rico shall be maintained in the District Court of the United States for Puerto Rico." [3]

Three months after the Butler amendment was approved, our Legislature, by Act No. 17 of June 3, 1927, amended, among others, § 16 of the Internal Revenue Law of 1925, including among taxable events the introduction into Puerto Rico of articles subject to tax. On May 6, 1931, it amended § 109 in order to read (as it still reads) as follows:

"Section 109.—From and after the date on which this Act is approved, and *in pursuance of the authority granted under section 3 of the Organic Act, as amended by Act of Congress approved March 4, 1927,* internal revenue taxes may be collected

---

[3] While the bill was under discussion in the House of Representatives, Congressman Mr. Kiess, in part, said:

"In making use of the authority granted by section 3 to levy and collect internal-revenue taxes the government of Porto Rico has found itself unable to collect said taxes on articles purchased in and sent from the United States to Porto Rico by mail, or sometimes when said articles are sent by vessel, as the courts have held that the post-office or customs officials have no authority to withhold delivery of such articles subject to the internal-revenue tax until the tax is paid, *as such tax collected in this manner is in effect a customs duty.* In other words, the courts have held that the internal-revenue tax can not be collected while the article subject to the tax is in the original package.

"This condition of affairs has practically nullified *the power of the insular government to levy internal-revenue taxes,* and therefore the efficacy of this source of revenue has been seriously impaired.

" . . . . . . . .

"*It is expected that the government of Porto Rico will so make use of this power as not to unnecessarily place any barriers in the way of the free-trade conditions now existing between [Puerto Rico] and the mainland, which is the principal factor in the progress and prosperity of Porto Rico."* (Italics ours.)

on articles, goods, wares or merchandise subject to taxation under this Law, *as soon as the same are manufactured, sold, used or brought into the Island*: Provided, That no discrimination shall be made between articles imported from the United States or foreign countries, and similar articles produced or manufactured in Puerto Rico." (Italics ours.)

The petitioner's marked interest in giving the internal-revenue tax under discussion the peculiar juridical nature of a typical customs duty, lacks legal consistency. The three-cent tax on each gallon of kerosene was established as the price to be paid, only once, for the privilege of selling, using, consuming or trading it in the insular market, and also for the privilege of bringing it in or introducing it into Puerto Rico without further consideration as to its ultimate disposal. The day of its introduction is the tax day, the date of maturity of the tax indebtedness and on which the power to collect it arises. Its introduction establishes the nexus between imports and our jurisdiction for taxing purposes merging with the property of the territory. A customs duty is a duty on imports and exports.[4]

The kerosene was brought to Puerto Rico, in the regular course of its business, by The Texas Co. (P.R.) Inc., the taxpayer-plaintiff, which is a domestic corporation constituted and organized for the "importation and purchase and sale of gasoline, kerosene and other petroleum products", as above stated. At no time did this dealer in petroleum and its by-products, allege, or attempt to allege, that the kerosene it brought here in the "Fort Lane" was not destined to be sold, used or consumed. Even in the event that it

---

[4] For greater clarity as to the nature of both taxes, the internal-revenue tax and the customs tax, we refer to the internal-revenue laws drafted by federal legislation. In those laws, when applied to imports, the levying and collection are implemented in practice together with customs laws without thereby either tax losing its peculiar nature. Pursuant to the provisions of the Federal Revenue Act, 1954 (Title 26 U.S.C.A.), the internal-revenue tax is levied *in addition to any customs duty to which the different products being taxed may be subject.* See §§ 2306, 2356, 3422–3425, 3490, 3501.

had not been finally sold, the second sentence of § 7 of Act No. 85 considered it as introduced into the country "to be used or consumed by the person acquiring it." [5]

Neither from the title of our Internal Revenue Law nor from its context may it be gathered that Puerto Rico, a territory without customs or customs service of its own, shaped a typical customs duty on kerosene or on any other article. So much so that until June 3, 1927, when its § 16 was amended for the first time, that is, approximately 3 months after the Butler amendment was approved, the words "introduction" or "importation" did not appear in its title or in its text.

When considering this aspect of the controversy, the trial court very accurately held:

"The practical effect that such tax may have as a customs duty or the characterization of a 'customs impost' not collected by customs officers, that the commentators of law may attach to the tax, is something which we think should not worry us if on the other hand the Legislative Assembly has the constitutional power to tax the article as soon as it is imported into the Island and it is within the jurisdiction of Puerto Rico.

"Likewise, the constitutional debate as to whether or not the *mere* introduction or importation may be made a taxable event is short of academic and would be tantamount to creating a legal argument out of a subtlety.

"In this case, subdivision 29 of § 16 of the Internal Revenue Law levied a tax of 3 cents a gallon on kerosene or substitute

---

[5] Said § 7 "prevents any legal hocuspocus by which, under some ingenious theory that goods were brought here neither for sale nor use, excise taxes are avoided." *Puerto Rico Ilustrado* v. *Buscaglia, Treas.*, 64 P.R.R. 870, 907.

The reason advanced by the petitioner for its payment under protest on February 10, 1948, was: "Protest is made on grounds that kerosene involved was lost before landing and never entered Puerto Rico." The only ground set forth by its counsel in the Petition for Refund they presented on the following April 9 to the then Treasurer of Puerto Rico is as follows: "5. The petitioner considers that since the taxable article was lost prior to its being introduced into Puerto Rico and since it was never sold, transferred, used or consumed in this Island, it is entitled to the refund of the taxes in such concept."

therefor 'sold, transferred, used, or consumed in, *or introduced into Puerto Rico*'. The statute could have used the expression of the Butler Act itself 'as soon as it is brought into the Island', instead of 'or introduced', or could have said 'upon its introduction', or 'at its introduction', or any other similar form of expression. To practical effects all would mean the same thing, for if Puerto Rico may levy a tax *as soon as* the article is imported, without waiting for anything else, the importation or introduction is the act generating the tax and, therefore, the taxable event. And despite the doubts and fears as to the implications and impact of this power of Puerto Rico in the constitutional system of the United States, the fact is that it is not and it has not been our Legislative Assembly that has made an event locally taxable of the *mere* importation in Puerto Rico, but rather the United States Congress making use of its unlimited power to legislate for territories."

The power granted by Congress to The People of Puerto Rico by means of the Butler amendment, to levy a local tax on imports, either from the United States or from foreign countries, as soon as the goods were imported (subject to the single condition of uniformity), regardless of federal customs laws and regulations; regardless of the original package doctrine and regardless of whether its practical effect was a customs duty not collected by customs authorities, was established, as aptly put by the trial court, in the decision of the Federal Supreme Court in *West India Oil Co.* v. *Domenech*, 311 U.S. 20 (1940).[6] In that case the Court went beyond the problem involved on the basis of the tax that

[6] This issue was expressly and consistently left undecided in *Pyramid Products* v. *Buscaglia, Treas.*, 64 P.R.R. 788, 797, footnote 4; *Puerto Rico Ilustrado* v. *Buscaglia, Treas.*, 64 P.R.R. 870; *Ballester Hermanos* v. *Tax Court*, 66 P.R.R. 531, 553, footnote 21; *Gallardo* v. *Santini Fertilizer Co.*, 11 F.2d 587, 588, and *Buscaglia* v. *Liggett & Myers Tobacco Co.*, 149 F.2d 493, 494, footnote 1. This was why the constitutionality of an impositive power so specifically and clearly delegated by the Congress was for a long time at stake here despite the continued use thereof by our Legislature. We must point out that when this case was decided our Legislative Assembly had enacted many amendments to § 16 of the Act making the mere importation a taxable event. *Cf.* 13 L.P.R.A. §§ 1031–1063.

gave rise thereto, to focus and define globally the taxing power of Puerto Rico in the light of the Organic Act, other statutes and the Constitution.

After quoting in the opinion rendered in that case the pertinent part of the "proviso" added by the Butler amendment to § 3 of the Organic Act of 1917, the Supreme Court stated at pages 27–28:

"The plain purport of the words of this proviso is that any tax authorized by the Organic Act with respect to articles of domestic production may likewise be levied with respect to imported articles 'as soon as ... [they] ... are manufactured, sold, used, or brought into the island' provided only that there be no tax discrimination between articles brought from the United States and foreign countries and domestic articles. The amendment seems to have been occasioned by doubts which had arisen whether merchandise brought to the Island from the United States was subject to local taxation while in the original package and also whether the merchandise has, while in the control of the customs authorities, the same status as respects local taxation as goods similarly controlled which have been imported from foreign countries and whether the power of the insular legislature to tax imports from foreign countries was any greater than that of the states which are forbidden, by Clause 2, of § 10 of Art. I of the Constitution, to tax imports and exports without the consent of Congress. S. Rept. No. 1011, 69th Cong., 1st Sess., p. 2. *Cf. Sonneborn Bros.* v. *Cureton,* 262 U.S. 506, with *Baldwin* v. *Seelig,* 294 U.S. 511, 526. These questions were involved in *Puerto Rico Tax Appeals,* 16 F.2d 545, decided January 27, 1927, shortly before the amendment of § 3 of the Organic Act. The judgments in that case were reversed and the suits ordered dismissed by this Court for want of jurisdiction, October 24, 1927 (275 U.S. 56), after the amendment to the Organic Act of March 4, 1927, which deprived the federal Courts of jurisdiction in the pending and other like suits to restrain the assessment and collection of Puerto Rico taxes.

"Moreover practical difficulties appear to have been experienced in levying insular taxes upon goods on their arrival from the United States and while in the custody or control of

postal or customs officers, due to the fact that the local tax *while in its practical effect a customs duty* was not collected by postal or customs officials. S. Rept. No. 1011, 69th Cong., 1st Sess. *The doubts and the difficulty were removed by the amendment to § 3, giving the Congressional consent that articles should be subject to the taxing jurisdiction of the Puerto Rico legislature as soon as brought into the Island whether from the United States or from foreign countries,* and directing that the United States customs officials and postal service should aid local officers in the collection of the tax. *The effect of the broad language of the amendment was not only to subject to taxation all imported goods, whether from the United States or foreign countries, when brought into the Island in the original package, but to neutralize the regulatory effect of the customs laws and regulations in so far as they protected articles from local taxation after their arrival. Merchandise in the original package was thus subjected to tax when brought into the Island without regard to customs regulations. It would seem plain that other merchandise not in the original package was left in no more favorable situation and in the face of the broad and unambiguous language of the statute we cannot say that the one, more than the other, is immune from local taxation. . . . "* (Italics ours.)

In *Pyramid Products* v. *Buscaglia, Treas.,* 64 P.R.R. 788, 795 (1945), we held, among other things:

"The decision rendered by the Supreme Court of the United States on November 20, 1940, in *West India Oil Co.* v. *Domenech,* 311 U.S. 20 (1940), dispelled the doubt as to the power of the Legislature of Puerto Rico under § 5 of the Organic Act—as amended by the Butler Act of 1927—to levy taxes on articles imported from the United States or from foreign countries as soon as they were introduced into Puerto Rico. In said case Act No. 40 of 1931 now before us was not in question. There was challenged the power of the Treasurer to demand and collect the 2 per cent tax (Internal Revenue Law, § 62 as amended by Act No. 17 of June 3, 1927, p. 457) on the fuel oil which the plaintiff therein had imported in Puerto Rico and deposited in bonded tanks under the control of the Custom Service, from which the oil was released under the supervision of the Federal agents, to be delivered, in compliance with sale

contracts, to vessels for use as fuel upon their voyages to foreign countries. It was held by the Supreme Court of the United States that, under the Butler Act, Congress authorized the Legislative Assembly of Puerto Rico to levy taxes on articles imported from the United States or from foreign countries as soon as they were introduced into Puerto Rico, provided that no discrimination was made between imported articles and those produced in the Island, that this power extended not only to merchandise in its original package but to that which was not as well, and further that the 2 per cent sales tax under the aforesaid conditions was valid.

" . . . . . . . . . . . .

"The policy of the Legislative Assembly as evinced in legislation, whether contemporary with, or prior or subsequent to, Act No. 40 of 1931, was not to tax articles imported from the United States or foreign countries unless said articles were imported for sale or consumption in Puerto Rico. This policy was abandoned, as admitted by the appellant, on February 1942, after the decision of the Supreme Court of the United States in *West India Oil Co.* v. *Domenech, supra,* became known and when Act No. 217 of 1942—which amended Act No. 40 of 1931—was in its formative stage whereby a tax was levied on the gasoline imported from foreign countries or the United States *independently of whether said gasoline was to be consumed in Puerto Rico. . . ." (Italics ours.)

Seven years after the decision of the aforesaid *West India Oil Co.* case, the Court of Appeals for the First Circuit decided *Buscaglia, Treasurer* v. *Ballester,* 162 F.2d 805 (1947), cert. denied 332 U.S. 816. The question raised in that case was whether certain merchandise purchased by the appellant in Argentina, which property was owned by it on January 15 and which arrived in the San Juan harbor on an Argentine vessel on January 13, 1943, but which was not released by the customs authorities for unloading until January 18 or 20, was subject to the general law levying *ad valorem* property tax assessed on January 15 of that year for the fiscal year 1943–44, pursuant to § 297 of the Political Code which, insofar as pertinent, provided: "all personal property within

or without Puerto Rico shall be assessed to the owner thereof . . . on the fifteenth day of January . . . ."

The appeal was taken from our judgment in *Ballester Hermanos* v. *Tax Court*, 66 P.R.R. 531 (1946), where (notwithstanding our decision of February 20, 1946, that is, about four months previously, in *Island Needlework, Inc.* v. *Tax Court*, 65 P.R.R. 685, 687, 689, and the decision in *General Oil Co.* v. *Crain*, 209 U.S. 211, and *Northwest Airlines* v. *Minnesota*, 322 U.S. 292, Annotation, 153 A.L.R. 264, 270) we held that "a local tax on an import is similarly inhibited when the merchandise is still on the incoming vessel in the custody of customs officials who have not yet issued a permit for its release to the importer." We reversed the order of the Tax Court and we remanded the case with instructions to enter an order in favor of the taxpayer. Our construction was too restricted and limited too much the letter, the spirit, and the effects of the Butler amendment and the ample opinion delivered by the Supreme Court of the United States in the *West India Oil Co.* case. We thereby eliminated the R.I.P. that both the 1927 amendment and the decision had placed on the tomb of the original package doctrine and we attempted its sad resurrection, at least, to face it with the collection of the tax on personal property imported at the time of its arrival in our ports, although holding that it was dead as to its application to the levying and collecting of internal-revenue taxes as soon as the taxed merchandise entered here.

The Circuit Court of Appeals reversed our decision and in the face of pleadings similar to those now made by the petitioner, The Texas Co. (P.R.) Inc., as to the fiscal power of Puerto Rico with respect to goods or merchandise in possession of customs authorities, it made the following pronouncements, among others, at 162 F.2d 806–09:

"On that date of the assessment of this tax the merchandise had physically arrived within the territorial jurisdiction of

Puerto Rico, and although not then unloaded or capable of being unloaded, it was on the stipulated facts destined to become, as in fact it later became, a part of the permanent mass of property in the Territory. On the critical date it had therefore acquired a taxable situs in Puerto Rico and in consequence the due process clause of § 2 of the Organic Act, 39 Stat. 951, 48 U.S.C.A. § 737, does not prevent imposition of the tax in question. *Gromer* v. *Standard Dredging Co.*, 224 U.S. 362, 32 S. Ct. 499, 56 L.Ed. 801.

"Nor does either the commerce clause, Art. I, Section 8, Cl. 3, or the clause prohibiting the imposition of duties or imposts on imports, Art. I, Section 10, Cl. 2, of the federal Constitution impose any barrier to the laying of the disputed tax.

"The commerce clause gives Congress plenary power to regulate our foreign and interstate commerce and thus as a necessary consequence it has the secondary effect of a restriction upon the power of the states in the premises. It thus has two aspects, but in neither of them, either as a grant of federal power or as a necessarily consequential limitation upon state power, does it affect Puerto Rico. In its aspects of a grant of power to the federal government it adds nothing to the comprehensive power given to Congress by the Constitution, Art. IV, Section 3, Cl. 2, to legislate with respect to national territory, and it can have no consequential effect of limiting territorial action since Congress already has the power under Art. IV, Section 3, Cl. 2, *supra*, to limit such action to any extent it chooses, even to the extent of annulling local legislation. See § 34 of the Organic Act. 39 Stat. 951, 961, 48 U.S.C.A. § 822 *et seq.*

"The constitutional prohibition upon the imposition of duties or imposts on imports is inapplicable because that prohibition is laid upon the states, and Puerto Rico, as we frequently have occasion to say, is not a state but an organized territory not incorporated into the United States. N.L.R.B. v. Padín Company, Inc., 1 Cir., 161 F.2d 353, and cases cited.

" . . . . . . . . . . . . .

"But the words 'internal-revenue taxes' do not describe a narrow category of taxes. They are used to describe any tax which a government may impose except duties on imports. That is to say, they are used to describe all taxes in general derived from internal sources as contrasted with taxes derived

from external sources. If the phrase 'internal revenue taxes' was used in the Butler Act to define some more narrowly limited category of taxes than this, we are at a loss to know what taxes were intended to be included in that limited category. And we think the Supreme Court must have interpreted the phrase as covering all taxes from internal sources, and hence all the taxes enumerated in the first sentence of § 3 of the Jones Act, when in West India Oil Co. v. Domenech, 311 U. S. 20, 27, 28, 61 S.Ct. 90, 92, 85 L.Ed. 16, it said that the 'plain purport' of the proviso added by § 1 of the Butler Act 'is that *any* (emphasis supplied) tax authorized by the Organic Act with respect to articles of domestic production may likewise be levied with respect to imported articles "as soon as they are manufactured, sold, used, or brought into the island" . . . '

"From this language we conclude that *even though the particular application of the insular general property tax to the appellee's merchandise may make that tax in its effects a duty or impost on imports, nevertheless it is a tax which Congress in the exercise of its plenary power in the premises has authorized the insular legislature to impose.*"

The doctrine of this federal decision was applied or cited with approval in *Soltero* v. *Descartes,* 192 F.2d 755, 759 (1951); *Estate of Albert,* 11 T.C. 742 (1948); *Mora* v. *Mejías,* 206 F.2d 377, 387 (1953); *Mora* v. *Torres,* 113 F.Supp. 309, 319 (1953); *Carrión* v. *González,* 125 F.Supp. 819, 823 (1954); *Guerrido* v. *Alcoa Steamship Co.,* 234 F.2d 349, 356 (1956).

As stated by the intervener in his brief—p. 9—the question is one of *lex scripta.* Puerto Rico received from the United States Congress in clear, ample, and precise terms, on the sole condition of uniformity in its exercise, the necessary fiscal power to levy and collect, with regard to imports and as soon as the merchandise was introduced into Puerto Rico, the same internal-revenue taxes it would levy and collect on articles manufactured locally. The mere fact of its introduction within our jurisdiction for taxing purposes or that this is its resting place or destination is enough in

order to be able to levy and collect the tax without taking into consideration the importer's ultimate disposition within the country, such as its sale, use or consumption.[7] This is one of the taxable events that in the alternative and independently form the picture of taxable events.

Nobody engages habitually or accidentally, in a platonic spirit, in the purchasing abroad of merchandise, goods, products or importable articles, subject to the payment of taxes, paying for the air or maritime transportation to Puerto Rico. The importer-seller or the importer-user or consumer brings them here for some useful end, purpose or design. Comprising the former, our statute employs the words "sale" or "transfer", and with respect to the latter, "use" and "consumption". Section 7 thereof provides that "the words 'use' and 'consumption'. . . shall be construed in their most usual meaning."

Such useful end is present in the background or motivation of every importation and the problem being thus met, from the viewpoint of the importer, petitioner's contention does not lack some principle of correctness that there can be no imported article. But the way of the cross that our fiscal officials had to travel from 1902 until March 4, 1927, in the collection of internal-revenue taxes on imported merchandise proved how useless or academic in the practical and functional aspect was the taxing power initially granted Puerto Rico by Congress. The conjunction of the factors, acquisition of the article abroad, its importation into the country and the final local disposition thereof, produced the Gordian knot of the problem. And the knot was undone in 1927 when Congress, for the purposes of imposition and collection, separated the introduction or importation from all further and possible local disposition of the imported article, providing

---

[7] As a matter of fact, the taxes were paid by the importer "voluntarily and without any requirement" 22 days after the arrival of the oil and its transfer, in part, to its storage tanks.

that the tax could be levied and collected "as soon as they are . . . brought into the Island". Thus the mere introduction or importation was constitutionally made to constitute another taxable event, regardless of any sale, disposition, use or consumption of imports.

As we held in *Porto Rico Telephone Co.* v. *Tax Court*, 68 P.R.R. 144, 152–53 (1948) :

"Those who buy goods elsewhere and use them in Puerto Rico enjoy our natural resources, the labor of our people and the service and protection of our government. Such merchandise should pay its way. A use tax coupled with a sales tax distributes the burden of this method of raising revenue equally between goods sold in Puerto Rico and goods purchased elsewhere for use here. In addition, there is no constitutional reason which compels the Legislature to place local vendors at a competitive disadvantage without of state vendors."

We can not approve the mistaken characterization attributed by the petitioner to the taxing power delegated by the Butler amendment. We would have to redraft, without any power thereto, by means of some phenomenon of construction, to its personal satisfaction, a piece of legislation, of a constitutional level, approved by Congress approximately 34 years ago and intended to enable The People of Puerto Rico, free from any hindrance or difficulties of a legal nature, to provide itself with all necessary income for its better progress and development, and to re-define the sense and scope of the judicial construction of courts that review our decisions.

None of the surviving provisions of the Foraker Act, nor the legislative form used by Congress when it permitted Puerto Rico to levy a customs duty on coffee (19 U.S.C. § § 1319, 1319a) bind us to agree with the petitioner. The former—see § § 2 of the Foraker Act and 58 of the Jones Act—did not prevent Congress from granting us the fiscal powers afforded us by the Butler amendment; the latter is but a variation of the congressional manner of granting

legislative powers, that may be delegated, to territories and even to states.[8]

For these reasons we conclude that the trial court did not commit the first three errors assigned or any one of them.

## II

■■ In support of the fourth assignment of error the petitioner argues that, assuming the existence of a taxing power permitting the levying and collection of internal-revenue taxes on imports because of the mere fact of their introduction into Puerto Rico, it was not bound to pay the tax on the kerosene because the latter was lost while being delivered and without having been landed and, therefore, that it was never imported, brought or introduced here.[9]

For the purposes of tax collection an importation consists of the arrival of the vessel within the limits of a port with the intent of entering foreign merchandise destined thereto.[10] The language of the Butler amendment explicitly refers to merchandise brought here from the United States as well as to merchandise brought from foreign countries. Even though our Internal Revenue Law uses indistinctly the words "introduce" and "import" to describe a single activity, there is a difference between the two, in common use. Introduction has a meaning of a broader scope than importation. The former may be the genus and the latter, the species.

---

[8] *Cf. International Shoe Co.* v. *Washington*, 326 U.S. 310, 315 (1945); *California* v. *Zook*, 336 U.S. 725, 728 (1946); *United States* v. *Green*, 137 Fed. 179 (1905); *Union Bridge Co.* v. *United States*, 204 U.S. 364 (1907); *Southern Pacific Co.* v. *Arizona*, 325 U.S. 761, 769 (1945); *Spector Motor Service* v. *O'Connor*, 340 U.S. 602, 608 (1951); *Prudential Insurance Co.* v. *Benjamin*, 328 U.S. 408 (1946); Biklé, *The Silence of Congress*, 41 Harv.L.Rev. 200 (1927); Braden, *Umpire to the Federal System*, 10 U. of Chi. L.Rev. (1942); Dowling, *Interstate Commerce and State Power-Revised Version*, 47 Col.L.Rev. 547, 552 n. 19 (1947).

[9] The petitioner has left on us the firm impression that it has followed the same line of thought of our decision in the *Ballester Hermanos* case, *supra*, in support of its taxing theory, whereby we had the subtle sensation of being before some sort of *post mortem* reconsideration of that decision.

We do not doubt in the least that the kerosene in question was introduced into, imported into or brought to Puerto Rico as its final destination, and placed within its jurisdiction for taxing purposes, on January 18, 1948.

The "Fort Lane" left Aruba with a cargo of 715,943 gallons of kerosene destined to three dealers of petroleum products in Puerto Rico, among them The Texas Co. (P.R.) Inc., to be delivered in the San Juan, Mayagüez, and Ponce ports. At midnight on January 17–18, 1948, it arrived in the San Juan harbor and docked at Pier No. 13. Of the total amount, 6,343 gallons were, as an estimate, deducted as the natural and usual decrease supposed to occur in maritime trips to this kind of product. They first began to deliver to The Texas Co. (P.R.) Inc. the portion of the shipment corresponding to it. The discharge of the kerosene from the vessel to the tanks of the petitioner, by means of devices also belonging to the latter, began at 1:40 a.m., that night, under the close inspection and main vigilance of its employee, Richard B. Polk. At 3:10 the operation was being conducted normally and at that time 1,000 barrels of kerosene had been unloaded into the tanks of the petitioner. At that time (3:30 a.m.) Polk withdrew to Pier No. 14. At 4:45 a dock foreman, also an employee of the petitioner, who operated the unloading equipment, went to Pier No. 14 in search of Polk. When Polk returned to Pier No. 13 he found that the valve to discharge the kerosene was partially open and that it had not a device called "blind flange" that was used as an added security measure during the unloading. The vessel was no longer unloading. Later on Polk inspected the waters of the harbor and discovered a film of petroleum floating on the water.

[10] *Mata* v. *United States*, 19 F.2d 484 (1927); *The Squanto*, 13 F.2d 548 (1926). *Cf. Oregon Liquor Control Commission* v. *Anderson Food Markets*, 160 Ore. 646, 87 P.2d 206; *Miranda* v. *People of Puerto Rico*, 101 F.2d 26, 29; *American Sugar Refining Co.* v. *Bidwell*, 124 Fed. 677, 681.

The parties stipulated that the kerosene lost into the sea amounted to 183,136 gallons and that the loss "was due to the negligence of the dock foreman, an employee of the plaintiff, who, being responsible for the proper operation of the receiving lines or pipes of the plaintiff, left partially open plaintiff's valve to receive kerosene located in Pier No. 13, and who also failed to attach the blind flange to the valve as an added measure of security."

The "Fort Lane" delivered the remaining shipment in the Mayagüez harbor on January 19 and the next day in the Ponce harbor, to the other importers.

On the basis of these facts, which in part were stipulated and in part are proved by the documentary evidence attached to the record, no one can successfully claim that the kerosene in question was not imported into, introduced into or brought to Puerto Rico and that it was never within our jurisdiction for taxing purposes.

Since 1912 it was decided that Puerto Rico is authorized to levy a tax on property located in the San Juan harbor.[11] It has also been held that our Workmen's Accident Compensation Act is applicable to the maritime zone of Puerto Rico.[12]

[11] *Gromer* v. *Standard Dredging Co.*, 224 U.S. 362, 372.

[12] *Guerrido* v. *Alcoa Steamship Co.*, 234 F.2d 349, 356 (1956); *United Porto Rican Sugar Co.* v. *District Court*, 44 P.R.R. 904, 906 (1933).

Insofar as pertinent, § § 7 and 8 of the Jones Act provide:

" . . . all property which at the time of the cession belonged, under the laws of Spain then in force, to the various harbor works boards of Porto Rico, all the harbor shores, docks, slips, reclaimed lands, and all public lands and buildings not heretofore reserved by the United States for public purposes, *is hereby placed under the control of the government of Porto Rico, to be administered for the benefit of the People of Porto Rico; and the Legislature of Porto Rico shall have authority, subject to the limitations imposed upon ail its acts, to legislate with respect to all such matters as it may deem advisable.* . . .

"Sec. 8.—*The harbor areas and navigable streams and bodies of water and submerged lands underlying the same in and around the Island of Porto Rico and the adjacent islands and waters, now owned by the United States and not reserved by the United States for public purposes, be, and the same are hereby, placed under the control of the government of Porto Rico, to be administered in the same manner and subject to the same limitations as the property enumerated in the preceding section.* . . . "

We have already seen how the Circuit Court of Appeals in the *Ballester Hermanos* case held that personal properties brought to Puerto Rico from Argentina and located in the vessel pending unloading and under the customs custody, had here their situs for taxation and were within the jurisdiction for taxing purposes of the country.

The circumstances that brought about the loss of the kerosene did not create any tax immunity in favor of the petitioner. From the moment the "Fort Lane" docked at Pier No. 13 with the kerosene cargo, which product was subject to internal-revenue taxes, to be unloaded into its tanks, the importation or introduction into Puerto Rico was completed and from that moment there arose the tax indebtedness provided by subdivision 29 of § 16 of our Internal Revenue Law. The total or partial unloading thereof under the provisions of the Butler amendment and of our taxing statutes, is not a prerequisite for the birth of such obligation as decided in the often-cited case of *Ballester Hermanos*, by the Circuit Court of Appeals.

On the other hand, when the loss occurred through the negligent acts of the petitioner itself, performed through its employees, as a matter of fact the stage of customs control and custody had elapsed[13] and the kerosene was being pumped, under the inspection and direction of its employees, from the ship into its tanks. Polk testified that the total amount of the kerosene actually discharged into the tanks was 92,469.59 gallons which represents 33% of the total amount of the shipment destined to the petitioner.

Neither was the fourth error assigned by the petitioner committed.

### III

■■ In the fifth assignment the petitioner maintains that the trial court erred in refusing the refund under the

---

[13] See *Ballester Hermanos* v. *Tax Court*, 66 P.R.R. 531, 556, regarding the different reglamentary steps of the customs procedure.

154

provisions of § 16-C of the Internal Revenue Law, as amended by Act No. 426 of May 14, 1947.

When the tax liability involved herein arose, the text of that § 16-C, insofar as pertinent, read as follows:

"Section 16-C.—The following objects or effects shall not be subject to the payment of the excises levied by this Act:

"(a) . . . . . . . . . . . .

"(b) *Those which, upon their receipt,* are damaged, spoiled, or destroyed; or those which have evaporated or been *lost by breakage;* Provided, That in any of the preceding cases the person who alleges that he is not bound to pay the excises shall furnish to the Treasurer of Puerto Rico, within the fifteen (15) days following the date of importation, authentic and unquestionable proof of his right to the exemption; Provided, further, That if he does not do so within the term fixed, such consignee or person introducing such effects or objects, shall be obliged to pay on them the excises specified in this Act; ..." (Italics ours.)

The foregoing quotation creates a tax exemption. The same thing happens with the following § 16-B which declares exempt from payment of the excises imposed by the Internal Revenue Law, all apparatus, machinery or equipment that may be essential for the establishment and operation of industrial plants. With respect to this § 16-B we have already decided that it is a statute granting a tax exemption which should be strictly construed.[14] We make an identical pronouncement as to § 16-C. Since tax exemptions are derogations of the power of a state, they must not extend beyond the express and exact terms of the statute granting them and every doubt must be resolved against exemption from taxation.[15]

As we note in footnote 5, the petitioner requested from the then Treasurer of Puerto Rico the refund of the excises

---

[14] *Sucn. Serrallés* v. *Tax Court,* 73 P.R.R. 33, 36 (1952); *Descartes, Treas.* v. *Tax Court,* 71 P.R.R. 479, 483 (1950).

[15] *Cía. Ferroviaria* v. *Sec. of the Treasury,* 80 P.R.R. 507, 516 (1958); *Francis* v. *Tax Court,* 74 P.R.R. 18, 23 (1952).

because it considered "that since the taxable article was lost prior to its being introduced . . . " it was entitled to such refund. The statement to the effect that the kerosene had been lost prior to its being introduced, was not justified by the actual facts. The product was introduced, was placed at the disposal of the petitioner for discharge, and if the petitioner did not discharge it in full, it was due to its own and evident lack of diligence, or, as it itself stipulated:

"... was due to the negligence of the dock foreman, an employee of the plaintiff who, being responsible for the proper operation of the receiving lines or pipes of the plaintiff, left partially open plaintiff's valve to receive kerosene located in Pier No. 13, and who also failed to attach the blind flange to the valve as an added measure of security."

We wish to say in passing that Polk's deposition reveals that he acted with quite a lack of diligence in connection with the discharge when he left for over an hour the place where the discharge was taking place, thereby contributing also to the imported product becoming unusable.

The product, neither upon receipt, nor at any other time prior to receipt, was damaged, spoiled or destroyed; nor had it been *lost by breakage* even after receipt. The fact that the 181,140 gallons fell into the waters in the harbor because the dock foreman, its employee, left partially open the valve to receive the kerosene and, in addition, because he failed to place the blind flange as an added security measure, and because Polk, its other employee, did not act as a diligent assistant of operations, is not equivalent to the loss by breakage fixed in precise terms by the statute to grant the tax exemption. Neither the receiving valve, nor the added security measure broke down, or were even damaged. While both were utilized in the proper manner, the unloading into the tanks took place, as Polk said, normally, and to the extent that 92,469.59 gallons at natural temperature had been

pumped into the tanks. No breakage prevented the remaining 181,140 gallons from being pumped into those same tanks.

The only thing with respect to this point that the petitioner tells us in its brief is the following: "It seems clear that the merchandise involved herein was destroyed or lost." It tells us no more. Those 12 words have not had the effect of convincing us that under the attendant circumstances it suffered the loss by breakage contemplated in the tax exemption it seeks, even if we considered the words of the statute in their ordinary and practical meaning. We cannot recognize a broadness or elasticity in the precise terms of the exemption to such an extent as to render a loss by negligence equivalent to a loss by breakage,[16] under the specific circumstances of this case.

On the other hand, § 16-C imposes as a condition to be complied with by the taxpayer that he "shall furnish to the Treasurer of Puerto Rico, within the fifteen (15) days following the date of importation, authentic and unquestionable proof of his right to the exemption." The 15-day period became due on February 2, 1948, without the petitioner having complied with the condition of the exemption it claimed. It did not pray for an extension of time. It was 82 days after the importation that it informed the Treasurer that it was "willing" to present authentic proof. It deems that it complied fully with the condition because on May 10, 1950, that is, two years and three months after the introduction, it signed the second stipulation in the course of the judicial proceeding it filed to obtain the refund and in which the parties stated that certain internal-revenue agent was

---

[16] In *Cervecería India* v. *Tax Court*, 70 P.R.R. 336 (1949) we considered a question of tax exemption because of spoilage through "natural and inevitable causes, there having been no . . . fault or negligence". Inasmuch as the exemption involved therein was authorized for "physical losses that . . . occur during rectification" and not "losses due to chemical reactions . . . after . . . manufacture", we held that the exemption did not lie.

present where the aforesaid loss occurred and became aware "of the causes thereof". Were any probatory effect to be given to such stipulated fact, it would be in the sense of verifying that no loss by breakage had occurred, but rather a loss by negligence which was precisely what the parties stated in the first stipulation.

The trial court, considering this point under the hypothesis that a loss by breakage might have in fact occurred, correctly stated:

"Upon carefully examining § 16-C(b) we realize that the requisite of furnishing authentic and unquestionable proof to the Treasurer within 15 days following the introduction or within the extension granted, is to the effect that the object be tax *exempt*, that is, to the effect that the Treasurer decide as a matter of fact that such specific object does not pay. And the noncompliance with the requisite results, according to the same Section, in the taxpayer having to pay the tax. It seems to us, however, that once the tax is paid, the taxpayer could avail himself of other statutes granting him the right to ask for reimbursement if in fact the tax is illegal or null and void, or has been collected or paid in excess, or erroneously and unduly, and resort to this Court in the event of the Treasurer's refusal to reimburse.

"Nevertheless, it also seems to us that when the statute specifically imposed the requisite that the taxpayer had to furnish the Treasurer with authentic and unquestionable proof of his right to the exemption on the ground that the object was damaged, spoiled or destroyed, or had evaporated or been lost by breakage within a relatively short time, it was the intent of the lawmaker that the question *of fact* as to the damage, spoilage, destruction, evaporation or loss by breakage upon receipt of the object, be elucidated before the Treasurer in order that the latter could make an administrative determination *of fact* on the issue when he still has the means to verify the claim.

"Thus, as to the allegations contained in the original complaint regarding the constitutional validity of the tax involved herein, undoubtedly the plaintiff could have requested the refund of the tax paid and upon said refund being refused, it could have sued as it has done. But insofar as the plaintiff bases its

claim on the additional allegations in its amended complaint to the effect that the product was tax exempt under the provisions of § 16-C(b) of the Internal Revenue Law, we consider that the plaintiff should have exhausted the administrative remedy first and given the Treasurer an opportunity to decide administratively whether the product was damaged, spoiled, destroyed, had evaporated or been lost by breakage upon receipt. In other words, we consider that there has not been the necessary administrative decision by the Treasurer as to this aspect of the controversy authorizing us to consider and decide it judicially in the first instance."

The judgment appealed from will be affirmed.

Mr. Justice Santana Beccerra did not participate herein.